In re THE PETITION FOR REINSTATEMENT OF Sharon D. RAMIREZ, a Minnesota Attorney, Registration No. 231162.

No. A04–2499.

Supreme Court of Minnesota.

Aug. 17, 2006.

William J. Wernz, Dorsey & Whitney LLP, Minneapolis, MN, for Appellant Sharon D. Ramirez.

Betty M. Shaw, Acting Director, St Paul, MN, for Respondent Office of Lawyers Professional Responsibility.

## OPINION

PER CURIAM.

In this case we consider the recommendation of a three-member panel of the Lawyers Professional Responsibility Board that disbarred attorney, petitioner Sharon Ramirez, be conditionally reinstated to the practice of law in Minnesota. The Director of the Lawyers Professional Responsibility Board (the director) challenges the panel's conclusion that Ramirez has proved by clear and convincing evidence that she has undergone the requisite moral change to render her fit to resume the practice of law. The director recommends that Ramirez be denied reinstatement. We have independently reviewed the record and we conclude that Ramirez is entitled to be reinstated to the practice of law, subject to conditions recommended by the panel and described more fully below.

Ramirez was admitted to the practice of law in Minnesota in October 1992. She was employed as an in-house government affairs attorney from 1992 until August 1996. From June 1994 to July 1996, Ramirez submitted "well over 14–15" improper requests for reimbursement of travel expenses to her employer. Ramirez knew these requests were false and improper, and her conduct in submitting the requests involved planning and conscious decisions on her part. In July 1996, Ramirez falsely represented to her employer that she had

attended a meeting out of state. A corporate audit resulted, and on the advice of her supervisor, Ramirez resigned in the middle of an audit meeting. In November 1997, Ramirez stipulated to disbarment, which we then ordered. *In re Ramirez*, 577 N.W.2d 480, 481 (Minn.1997). As a result of her misconduct, Ramirez was charged in Ramsey County District Court with theft by swindle, to which she pleaded guilty. She was sentenced to 90 days incarceration and 10 years of probation, and was ordered to pay restitution to her employer. Ramirez was fully discharged from probation more than 5 years early and satisfied her restitution obligation ahead of schedule.

After her release from jail, Ramirez was employed for approximately 1–1/2 years as a program manager for the Battered Women's Legal Advocacy Project. Since February 2001, Ramirez has been employed by the United States Bankruptcy Court in Puerto Rico (the bankruptcy court). Initially she held the position of legal analyst at the bankruptcy court, which involved legal research and case administration for bankruptcy court judges. Her position later changed to team supervisor of case administration and then to team supervisor for the core services team. One of her current responsibilities is supervising the reconciliation clerk, who each day reconciles the daily transactions of court fees with cash register receipts.

In December 2004, Ramirez petitioned for reinstatement to the practice of law, as permitted by Rule 18, Rules on Lawyers Professional Responsibility (RLPR).[1] As required by Rule 18, the director investigated and reported to a three-member panel of the Lawyers Professional Responsibility Board. The director took no clear position on Ramirez's petition at the panel hearing and presented no witnesses. The panel concluded that Ramirez had demonstrated evidence of both moral change since her disbarment and fitness to practice law. The director now challenges the panel's conclusion that Ramirez has proven by clear and convincing evidence that she has undergone the requisite moral change to render her fit to resume the practice of law.

The first witness at the panel hearing was a professor who had supervised Ramirez in a civil practice clinic during law school and with whom she has remained in contact over the years. The professor testified that he had spoken with Ramirez about her misconduct both before she was disbarred and after her release from jail, and that Ramirez never discounted her personal responsibility. The professor testified that Ramirez had insight into the wrongfulness of her conduct, never denied her guilt, accepted full responsibility for her conduct, exhibited remorse, and had taken positive steps to "restore her soul and rebuild her reputation."

Ramirez's next witness was an attorney who had been her friend since law school and who had accompanied Ramirez to her first court appearance and her sentencing hearing, visited her in jail, and helped her find employment upon her release. This witness testified that Ramirez took ownership of her actions, demonstrated insight

---

1. In Minnesota, a disbarred attorney is permitted to apply for reinstatement to the practice of law by petition to this court. Rule 18, RLPR. The director conducts an investigation and reports conclusions to a panel of the Lawyers Professional Responsibility Board. *Id.* at (a)-(b). The panel may conduct a hearing, as was done here, and the panel then files its recommendations with this court. *Id.* at (c). Unless specifically waived by this court, a disbarred attorney must successfully complete the Minnesota Bar Examination and the Multistate Professional Responsibility Examination, complete CLE requirements, and satisfy all claims made against him by the Client Security Board. *Id.* at (e)(1), (4).

into the wrongfulness of her conduct, and accepted personal responsibility. She also testified that the experience made Ramirez wiser, profoundly changed and shaped the way she acts, and made her "brutally honest" and "extremely candid." The witness testified that Ramirez is now "more diligent" and "adheres to the letter of the law" without deviation.

The panel also heard testimony from two of Ramirez's current coworkers and her current supervisor. Ramirez's coworkers testified that they believe Ramirez regrets and accepts responsibility for her misconduct, and that she is responsible, intelligent, committed, motivated, honest, and a trusted coworker. They also testified that Ramirez disclosed her misconduct to them prior to petitioning for reinstatement and that her disclosure was not related to her petition.

Ramirez's supervisor, the chief deputy clerk (chief deputy) of the bankruptcy court also testified. The two first met in late 2000 when the chief deputy interviewed Ramirez. Ramirez had applied for the position of legal analyst—which required a law degree but not a law license—by submitting a resume. During the interview, the chief deputy did not ask Ramirez if she had ever committed a crime or other misconduct. After Ramirez was hired, she was asked to fill out an employment application for her personnel file. No court employee reviewed this completed application before it was filed. Ramirez voluntarily provided a copy of her application to the director during the investigation of her petition for reinstatement.

On this application, Ramirez answered "yes" to the question: "Have you ever been convicted?" and added the note, "please contact me to discuss." Ramirez also indicated that she was not admitted to the bar, and that her bar membership was inactive.[2] In response to the question, "Have you ever been discharged from a position or asked to resign under threat of discharge?" Ramirez answered "no." Ramirez testified that she "took [the question] on its face" and believes she answered it truthfully based on her perspective and the information available to her at the time she resigned. At that time, she did not fully comprehend the seriousness of the investigation, and she resigned based on the advice of her mentor, but did not believe that her resignation was under threat of discharge. Ramirez now believes that she would have been fired if she had not resigned when she did. Another application question asked Ramirez's reason for leaving her position as a government affairs attorney, and Ramirez indicated that she was relocating to North Carolina. Ramirez testified at the panel hearing that the gap between her resignation and her move to North Carolina was actually several months, but that she would have relocated to North Carolina regardless of her misconduct because of family reasons. Ramirez now acknowledges that her application answer regarding the reason for leaving her position was misleading.

When Ramirez decided to petition for reinstatement, she informed the chief deputy of her conviction and disbarment.[3]

---

**2.** We note that the dissent asserts that Ramirez made a "decision to keep her true status from her supervisor" and that she "finally told the truth" only when she decided to petition for reinstatement. This assertion disregards Ramirez's truthful responses to ques-

tions about her conviction and inactive bar status in her job application.

**3.** We reiterate in response to the dissent's concern about the timing of Ramirez's disclosures to her supervisor that Ramirez had disclosed her conviction and inactive bar status

The chief deputy testified that her foremost concern upon learning this information was the integrity of the bankruptcy court and its hiring process. After reviewing Ramirez's hiring process, including her responses on the application, the chief judge and the clerk of the bankruptcy court determined that there was no legal basis to terminate Ramirez's employment. The chief deputy testified that she believes Ramirez accepts responsibility for her misconduct, is remorseful, "is very careful of not bending any of the rules," and that the chief deputy believes Ramirez acts this way because of ongoing feelings of guilt.

Ramirez testified on her own behalf at the panel hearing. She explained that a desire to take responsibility for her misconduct was the reason she pleaded guilty, served her sentence, paid restitution quickly, and "continued to live a life that has shown that I am not the same person who would make that kind of decision, to take the money that I took back in 1995 and '96." She testified that she is remorseful for many different reasons, and on many different levels. She stated that she brought shame on herself, her family, her profession, and her colleagues. Ramirez testified that she petitioned for reinstatement because she wants to continue to grow in her career.

The panel concluded that Ramirez complied with Rules 24 and 26, RLPR, and proved by clear and convincing evidence that she has undergone the requisite moral change to now render her fit to resume the practice of law. The panel expressly adopted the professor's conclusion that Ra-

mirez "has restored her soul." The panel also concluded that Ramirez possesses the intellectual competency to practice law. Ramirez has not yet retaken the bar examination, but she has earned 56.75 CLE credits and has applied for approval of an additional 42 hours of CLE credit.

Rule 18, RLPR, provides for reinstatement of disbarred attorneys. While reinstatement after disbarment is the rare exception to the rule,[4] a disbarred attorney who meets the heavy burden of demonstrating her rehabilitation will be reinstated. *In re Anderley,* 696 N.W.2d 380, 385 (Minn.2005). "Disbarment should not be considered permanent in every case and one disbarred should not be considered irredeemable, for if disbarment were permanent in all cases, [Rule 18] would be a cruel hoax." *In re Swanson,* 343 N.W.2d 662, 664 (Minn.1984).

An attorney seeking reinstatement must prove by clear and convincing evidence that she has undergone a moral change such that clients can have complete confidence in her competence and morality. *Anderley,* 696 N.W.2d at 384–85. The petitioning attorney is required to provide stronger proof of good character and trustworthiness than is required in the original application for admission to practice. Id. at 385. In addition to proof of moral change, we consider five factors: (1) the attorney's recognition that her conduct was wrong; (2) the length of time since the misconduct and disbarment; (3) the seriousness of the original misconduct; (4) the attorney's physical or mental illness or

on her job application. We also note that Ramirez had informed bankruptcy court co-workers of her conviction and disbarment under circumstances that were completely unrelated to her petition for reinstatement.

4. Since 1985, we have disbarred 57 attorneys. During the same time period, we reinstated

only four disbarred attorneys to the practice of law. *In re Anderley,* 696 N.W.2d at 381; *In re Trygstad,* 472 N.W.2d 137, 138 (Minn. 1991); *In re Reutter,* 474 N.W.2d 343, 344 (Minn.1991); *In re Wegner,* 417 N.W.2d 97, 97 (Minn.1987).

pressures that are susceptible to correction; and (5) the attorney's intellectual competency to practice law. *Id.*

██ We independently review the entire record before determining if an attorney should be reinstated to the practice of law. *Anderley,* 696 N.W.2d at 385. The panel's recommendations are considered but are not binding on us. *See, e.g., In re Kadrie,* 602 N.W.2d 868, 869–70 (Minn. 1999) (reinstating suspended attorney over panel recommendation); *In re Williams,* 433 N.W.2d 104, 104 (Minn.1988) (reinstating suspended attorney over panel recommendation); *In re Wegner,* 417 N.W.2d 97, 97 (Minn.1987) (reinstating disbarred attorney over panel recommendation).

In this case, we conclude that the factors we consider weigh heavily in Ramirez's favor. The panel found that both Ramirez's recognition of her wrongdoing and her expression of remorse were sincere and credible. More than 8 years have passed since Ramirez was disbarred. Ramirez is not affected by physical or mental illness or pressures that require correction.[5] It is undisputed that Ramirez has the intellectual competency to practice law.

██ Ramirez does not challenge the panel's finding that her misappropriation of $30,000 from her employer was "very serious" misconduct. But as we have previously noted, the seriousness of misconduct "only rarely precludes further consideration of the attorney's petition for reinstatement." *Anderley,* 696 N.W.2d at 385 n. 6. In *Anderley,* we reinstated the petitioning attorney notwithstanding his

serious misconduct in devising a fraudulent claim against his insurance company client, forging and altering documents to validate, support, and settle that claim, obtaining approval from the insurance company for settlement in the amount of $48,500, misappropriating that settlement money, forging settlement documents, and billing his client for his work on the false claim and settlement. *Id.* at 381; *In re Anderley,* 481 N.W.2d 366, 367–68 (Minn. 1992). In *In re Trygstad,* we reinstated a disbarred attorney who had engaged in a conspiracy to distribute cocaine with a former client. 472 N.W.2d 137, 138 (Minn.1991). In *In re Wegner,* we reinstated a disbarred attorney who had participated in a conspiracy to smuggle marijuana into the United States and who had recruited others—including clients—to participate in the conspiracy. 417 N.W.2d 97, 98 (Minn.1987). We reiterate the facts of these previous cases not to marginalize the seriousness of the misconduct in each case, but to emphasize that the seriousness of the misconduct alone does not preclude consideration of a disbarred attorney's petition for reinstatement.

██ Having considered the panel's findings and conclusions and having independently reviewed the record, we now conclude that Ramirez has proven by clear and convincing evidence that she has undergone a moral change such that clients can have complete confidence in her competence and morality. Ramirez took responsibility for her misconduct in the disciplinary action, the criminal process, and with the people who were and have since

---

5. We note that the *absence* of physical or mental illness or pressures as an underlying cause of the misconduct appears to concern the director. It appears that the director's concern about Ramirez's reinstatement is based not on any specific misstep Ramirez has taken since disbarment, but on a lack of affirmative evidence of moral change during

that time. We acknowledge that an assessment of moral change can be more challenging when the misconduct leading to disbarment was not attributable to a problem that can be addressed through a formalized program or therapeutic process. But the absence of such an underlying problem does not preclude a finding of moral change.

become important in her life. Ramirez has gained the trust of those with whom she works, and that trust has not been shaken by revelation of her wrongdoing. Without exception, the witnesses at the panel hearing testified that they believe Ramirez is an honest and trustworthy person who is deserving of the responsibility and trust that being reinstated would place upon her. We are especially persuaded by the fact that our sister court, the United States Bankruptcy Court in Puerto Rico, has concluded that Ramirez is worthy of a position of trust that includes access to and responsibility for court fees.[6]

We conclude, as did the panel, that Ramirez has met the heavy burden of demonstrating her rehabilitation and of proving that she is fit to practice law, subject to certain restrictions. We therefore conclude that Ramirez will be entitled to reinstatement upon meeting the following conditions: that she (1) successfully complete the Minnesota bar examination, including the professional responsibility portion; (2) comply with CLE requirements; and (3) be placed on indefinite probation, requiring that she report her employment status to the director on at least a quarterly basis and promptly upon a change of status;

abide by the rules of professional conduct; cooperate with monitoring the conditions of her reinstatement and her practice; not engage in any employment using her Minnesota license in which she will have an expense account or access to monies until a system of supervision has been established or determined by the director to be unnecessary; and not engage in the private practice of law under her Minnesota license until a probation supervisor has been appointed or the director has determined that unsupervised probation is appropriate.

So ordered.

GILDEA, J. (dissent).

I respectfully dissent. I do not agree that Sharon Ramirez has proven by clear and convincing evidence that she has undergone a moral change such that clients can have complete confidence in her professional morality. I would deny reinstatement of Ramirez at this time.

The majority discusses the multi-prong analysis we follow in reviewing petitions for reinstatement. For me, this case begins and ends with analysis of moral

---

6. We note that some of Ramirez's answers on the employment application she submitted to the bankruptcy court over 5 years ago do raise concerns. Ramirez acknowledged her criminal conviction, affirmatively offered to provide more information upon request, and stated that she was not admitted to the bar and that her bar membership was inactive. Despite these admissions, Ramirez did provide a somewhat misleading response regarding her reason for leaving her former position, and her response to whether she had ever resigned "under threat of discharge" is open to interpretation. The bankruptcy court's conclusion that Ramirez's application responses provided no basis to terminate her employment leads us to believe that the bankruptcy court is satisfied that Ramirez's application as a whole was not deceptive. We accord considerable deference to this conclu-

sion by our sister court. *See Trygstad,* 472 N.W.2d at 140 (noting that we gave considerable deference to the South Dakota Supreme Court's denial of petitioner's reinstatement petition, but nevertheless granting reinstatement to the practice of law in Minnesota).

Furthermore, we have previously reinstated attorneys whose conduct since disbarment was not without blemish and/or who continued to struggle with undesirable character traits. *See, e.g., Anderley,* 696 N.W.2d at 383 (reinstating disbarred attorney who "does not show any symptoms of major psychopathology or psychopathy" but who would nonetheless "benefit from continued psychological counseling"); *Trygstad,* 472 N.W.2d at 139 (concluding that petitioner's unauthorized practice of law since his disbarment did not preclude reinstatement).

change. We have said that evidence of moral change "is the 'decisive' factor in considering a petition for reinstatement." *In re Reutter,* 474 N.W.2d 343, 345 (Minn. 1991). Applicants for reinstatement "must establish by clear and convincing evidence that" they have " 'undergone such a moral change' " that they are now fit " 'to enjoy the public confidence and trust once forfeited.' " *In re Hanson,* 454 N.W.2d 924, 925 (Minn.1990) (quoting *In re Smith,* 220 Minn. 197, 201, 19 N.W.2d 324, 326 (1945)). We require this "high standard of proof" so we can "be assured that reinstatement would serve the public interest." *Hanson,* 454 N.W.2d at 925. Finally, the evidence of moral change must be persuasive enough so "clients can have complete confidence in [their attorney's] competence and morality." *In re Anderley,* 696 N.W.2d 380, 385 (Minn.2005). In my view, Ramirez has not made the requisite high showing.

Ramirez was disbarred because, while working in the position of a government affairs attorney for the St. Paul Companies, she stole approximately $30,000 from her employer by repeatedly submitting false expense reports over a period exceeding 1 year. Subsequent to her disbarment, Ramirez was convicted of felony theft by swindle for her misconduct. She served time in jail and was placed on probation. A little more than 2 years after she was discharged from probation, Ramirez applied for reinstatement.[7]

The majority emphasizes Ramirez's continued employment by the Federal District Bankruptcy Court in Puerto Rico as evidence of her moral change. Although I agree that what happened with the bankruptcy court provides compelling evidence on the question here, I reach the opposite conclusion from the majority. In my view, the way in which Ramirez secured her job with the bankruptcy court confirms that she has not shown sufficient moral change to warrant reinstatement.

In applying for the position with the bankruptcy court, Ramirez filled out an application form that asked her the reason for leaving the St. Paul Companies. She wrote: "relocated to North Carolina." Although Ramirez testified that she had been planning to move to North Carolina at the time of her resignation, she testified that she would not have left the St. Paul Companies when she did if she had not been under investigation for stealing from her employer. She agrees that the bankruptcy court might have been misled by her answer to this question and also stated that "I think they would think that I left the company because I was going to another state." She also testified that what she wrote was "not the complete truth, but it's not a lie."

Not only did Ramirez fail to tell the bankruptcy court "the complete truth" in February 2001, but she also did not tell her supervisor about her felony conviction and disbarment for more than 3 years. Ramirez finally told her supervisor not because her conscience compelled her to do the right thing (i.e. because of moral change), but because she had decided to petition for reinstatement and "wanted to ask her [supervisor] to be a witness on [her] behalf." Such self-interested behavior does not support a finding of moral change.[8]

---

7. The majority notes that it has been over 8 years since Ramirez was disbarred. In my view, the relevant temporal issue is the time that has lapsed since Ramirez was discharged from probation. *See In re Swanson,* 343 N.W.2d 662, 665 (Minn.1984) (noting that

"the time passed since the expiration of probation is too limited to merit reinstatement").

8. While the majority is "especially persuaded" by what it characterizes as the bankruptcy court's decision to place Ramirez in a

We have said that "candor and integrity [are] required of a member of the bar." *In re Cunningham*, 502 N.W.2d 53, 57 (Minn.1993). In fact, it was Ramirez's lack of integrity in filling out expense reports that was the basis for her original disbarment. Ramirez's continued lack of candor in both the job application for her current job and her decision to keep her true status from her supervisor leaves me unconvinced that she is fit "to enjoy the public confidence and trust once forfeited." *In re Hanson*, 454 N.W.2d at 925 (quoting *In re Smith*, 220 Minn. at 201, 19 N.W.2d at 326) (internal quotation marks omitted).

"The practice of law is a privilege, not a right." *In re Swanson*, 405 N.W.2d 892, 893 (Minn.1987). We have previously not-ed that misconduct similar to the type that led to Ramirez's disbarment is "among the most serious acts of misconduct a lawyer can commit." *Id.* Misappropriation of client funds "strike[s] at the heart of the relationship of trust that must exist between attorney and client." *Id.* We have historically been very cautious in returning the privilege of practicing law to someone who has forfeited the public trust. I would exercise that same caution here and deny reinstatement at this time.

---

position of trust, I am not similarly persuaded. After learning the truth from Ramirez, Chief Deputy Clerk of the bankruptcy court, Wilma Jaime, testified that she was concerned about the integrity of the court's hiring process because the information about Ramirez's criminal conviction and disbarment should have been known at the time of hiring. Ultimately, the bankruptcy court decided that the failure to know about Ramirez's past misconduct "was an administrative error" and the court "determined that there was no legal basis to terminate her employment" based on the representations made by Ramirez in her application. In my view, the bankruptcy court's legal decision regarding employment is inapposite to the issue of whether Ramirez has demonstrated moral change by clear and convincing evidence.