**In re Petition for REINSTATEMENT OF Richard T. JELLINGER, a Minnesota Attorney, Registration No. 137765.**

No. A05–2091.

Supreme Court of Minnesota.

March 22, 2007.

Mark W. Gehan, Collins, Buckley, Sauntry & Haugh, PLLP, St. Paul, MN, for Petitioner.

Martin A. Cole Office of Lawyers Professional Responsibility, St. Paul, MN, for Office of Lawyers Professional Responsibility.

## OPINION

PER CURIAM.

A panel of the Lawyers Professional Responsibility Board recommended that petitioner Richard T. Jellinger, who was indefinitely suspended from the practice of law, be reinstated subject to a four-year probationary period and other terms and conditions, including a restriction on the practice of law as a solo practitioner and a requirement that he apply for malpractice insurance. Jellinger argues that the length of the probationary period and the terms and conditions on his probation are inconsistent with the panel's findings of fact. The Director of the Office of Lawyers Professional Responsibility (the Director) supports the panel's recommendations. We have independently reviewed the file and conclude that Jellinger is entitled to be reinstated to the practice of law, subject to a probationary period and a number of conditions which are described more fully below.

Jellinger was admitted to practice law in Minnesota on May 13, 1982. For eight years, he practiced in a number of different settings. Jellinger then spent four years working for the Minnesota State Bar Association. In 1994, he opened his own practice, where he continued to work until we temporarily suspended him in 2001.

On May 3, 2001, because Jellinger "did not read or respond to the Director's inquiries, * * * commingled client funds with operating funds in the trust account, neglected a client matter, failed to place a client's retainer in trust, and repaid the client with funds from a personal account," we publicly reprimanded Jellinger and placed him on probation, subject to certain conditions. *In re Jellinger*, 625 N.W.2d 143, 146–48 (Minn.2001).

Thereafter, Jellinger failed to comply with the terms of his probation, and the Director filed a petition for temporary suspension. The Director alleged that Jellinger failed to respond to correspondence regarding his probation and failed to respond to notices of investigation of additional complaints of professional misconduct. *In re Jellinger*, 632 N.W.2d 640, 641 (Minn.2001). Jellinger did not respond to the petition, so we deemed the allegations admitted,[1] and on August 17, 2001, we temporarily suspended Jellinger from the practice of law, pending final determination of the disciplinary proceedings. *Id.*

On November 29, 2001, the Director filed a supplementary petition for further disciplinary action, and the matter was referred to a referee. *In re Jellinger*, 655 N.W.2d 312, 313 (Minn.2002). We upheld the referee's findings of misconduct—that Jellinger had misappropriated client funds, that he had failed to communicate with his clients, that he had neglected clients, that he had made false statements to clients, and that he had failed to cooperate with the Director's investigation—and we concluded that Jellinger failed to prove his claim of mitigation by clear and convincing evidence. *Id.* at 315–16. We noted that Jellinger's treating psychologist had testified that Jellinger had a major depressive disorder and that, in the psychologist's opinion, Jellinger's misconduct was "in large part a result of his depressive disorder." *Id.* at 314. But we concluded that Jellinger had failed to prove that his depression was the cause of his misconduct. *Id.* at 315–16.

While we acknowledged that Jellinger's depression might have caused his passive misconduct, we concluded that the psychologist's testimony did not indicate that the depression was the likely cause of Jellinger's "affirmative acts of dishonesty (misap-

---

1. *See* Rule 16(c), Rules on Lawyers Professional Responsibility (RLPR).

propriating funds from client accounts, making false statements to clients and making false statements to the Director's office)." *Id.* at 315. Further, we concluded that, because he had only been undergoing treatment for two months, and his psychologist had prescribed a course of treatment that would take from two to three years to complete, Jellinger failed to prove that his recovery was sufficient to arrest the misconduct and therefore failed to prove that his misconduct was not apt to recur. *Id.*

We said that "ample precedent supports the sanction of disbarment in cases involving misappropriation of client funds." *Id.* at 316. But we noted, as mitigating factors, that there was a causative relationship between Jellinger's depression and his passive misconduct and that Jellinger's former clients did not ultimately suffer any pecuniary loss as a result of his misconduct. *Id.* Therefore, on December 26, 2002, we disbarred Jellinger, but stayed the disbarment subject to indefinite suspension. *Id.* at 316. We ordered that Jellinger could not petition for reinstatement for at least two years, and said that "[u]pon reinstatement, [Jellinger] shall be on supervised probation for a period of two years under the conditions set forth in this court's order of May 3, 2001." *Id.* at 317.[2]

After we indefinitely suspended him, Jellinger found employment for a short time as a tax preparer, and as a driver for a local courier service. Since July 2003 Jellinger has worked as a part-time paralegal.[3]

On October 19, 2005, Jellinger petitioned for reinstatement pursuant to Rule 18 of the Rules on Lawyers Professional Responsibility (RLPR). The panel heard the matter on June 30, 2006.[4]

The panel received testimony from Jellinger's psychologist by way of deposition. The psychologist opined that Jellinger's depression "has dropped from the moderate range to the no concern range." The psychologist also stated that "there does not seem to be any data that would preclude his ability to practice law" and that Jellinger "has been maintaining good mental health and practicing good self care." Finally, the psychologist suggested that it would be important for Jellinger to have a "network of colleagues" to consult with on a semi-regular basis.

W.K., who has known Jellinger since 1985, and for whom Jellinger has worked in a paralegal capacity, also testified before the panel. According to the panel's findings, W.K. testified that he and Jellinger had discussed Jellinger's past misconduct in detail, and W.K. had discussed with Jellinger at length how to successfully and ethically operate as a solo practitioner. Additionally, W.K. told the panel that if Jellinger were to be reinstated, W.K. would be willing to act as a co-signer on Jellinger's trust account. W.K. acknowledged that this responsibility would re-

---

2. The specific conditions on Jellinger's probation are set forth at *Jellinger,* 625 N.W.2d at 148–49. These conditions do not include a restriction on practice as a solo practitioner or a requirement that Jellinger apply for malpractice insurance. *Id.*

3. On October 24, 2003, the Director issued Jellinger an admonition for conduct that took place before Jellinger's indefinite suspension but while he was on probation. The Director issued the admonition because Jellinger had failed to adequately communicate with a

client, failed to return a retainer fee, and failed to notify the client that he had been suspended.

4. The parties did not order a transcript of the hearing before the panel. Our recitation of the facts is therefore taken from the panel's findings of fact. *Cf.* Rule 14(e), RLPR ("Unless the respondent or Director * * * orders a transcript * * * the findings of fact and conclusions shall be conclusive.").

quire him to be familiar with the client files and services being performed by Jellinger. W.K. also told the panel that he did not believe he could hire Jellinger as an employee, because Jellinger's practice was different and because W.K. wanted to reduce, rather than increase, overhead.

Jellinger also testified before the panel. According to the panel's findings, Jellinger expressed shame and remorse over his misconduct. He acknowledged that he will continue to struggle with "depression and honesty issues," but said that he feels better equipped to handle such issues, in part because of his anti-depression medication and because of his work with his psychologist to identify the warning signs of depression. The panel also noted that Jellinger testified about his business plan, and that W.K. has taught him about the network of lawyers available for him to contact in various areas of law practice.

Jellinger's attorney argued to the panel that Jellinger should be reinstated subject to supervised probation for a period of two years, provided that Jellinger enter into an "of counsel" arrangement with W.K.[5] The Director argued that Jellinger should be denied reinstatement for failing to show by clear and convincing evidence that he had achieved the requisite moral change required for reinstatement. In the alternative, the Director argued for reinstatement subject to a two-year period of supervised probation and subject to further terms and conditions including: monitoring by an attorney approved by the Director, no practice as a solo practitioner for one year, and

the adoption of approved office procedures related to the handling of client funds and maintenance of a trust account.

The panel concluded that Jellinger had proven by clear and convincing evidence that he has:

(a) completed the required two-year period of suspension, (b) continued treatment for his depression and arranged for his psychologist to report periodically to the Director concerning the progress of his treatment, (c) paid the costs required by Rule 24, RLPR, (d) successfully completed the professional responsibility exam, (e) satisfied his CLE requirements, and (f) complied with Rule 26, RLPR.

The panel also concluded that Jellinger "possesses current legal skills and knowledge," "is psychologically fit to resume the practice of law, as it relates to his prior passive misconduct," "currently has in place adequate personal and professional support systems to assist him in managing the stress and practicalities of a law practice," and "has shown the requisite moral change as to his prior dishonesty."

On the basis of these findings of fact and conclusions of law, the panel recommended reinstatement, subject to a four-year period of supervised probation under a number of terms, including (1) that Jellinger not engage in the practice of law as a solo practitioner for two years from the date of the reinstatement order; and (2) that Jellinger apply for malpractice insurance.[6]

5. This relationship would essentially require W.K. to act as a co-signer on Jellinger's trust account, to be familiar with Jellinger's client files, and to serve as, in effect, a financial probation officer who would monitor the financial side of Jellinger's practice.

6. The remaining terms and conditions recommended by the panel are generally consistent

with the terms and conditions set forth in our May 3, 2001 order. *Jellinger*, 625 N.W.2d at 148. One other condition, however, was not part of our May 3, 2001 order: the requirement that Jellinger have another attorney co-sign all checks written on his trust account. Jellinger does not object to the inclusion of this condition.

## I.

 Our first consideration is whether Jellinger should be reinstated to the practice of law. We independently review the entire record in reinstatement proceedings to determine if an attorney should be reinstated. *In re Kadrie*, 602 N.W.2d 868, 870 (Minn.1999). We consider the panel's recommendations, but we are not bound by them. *Id.*

 "[A]n attorney applying for reinstatement must establish by clear and convincing evidence that she or he has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited." *In re Porter*, 472 N.W.2d 654, 655 (Minn. 1991) (quoting *In re Hanson*, 454 N.W.2d 924, 925 (Minn.1990)). Evidence of moral change is, however, only one factor. *In re Kadrie*, 602 N.W.2d at 870. Other factors to be considered are: "(1) [the attorney's] recognition of the wrongfulness of his conduct; (2) the length of time since the misconduct and [the] disbarment or suspension; (3) the seriousness of the original misconduct; (4) the existence of physical or mental illness or pressures that are susceptible to correction; and (5) [the attorney's] intellectual competency to practice law." *Id.* (internal citations omitted).

The panel concluded that Jellinger has undergone the moral change required to be reinstated to the practice of law. And the Director no longer argues that Jellinger is unfit to be reinstated. The panel found that Jellinger expressed shame and remorse over his misconduct and that Jellinger indicated that he knew what he did was wrong. The panel's findings also indicate that Jellinger has gained control of his depression by working with his psychologist and by taking anti-depression medication. The panel noted that Jellinger said he is now aware of the warning signs of depression and that he will seek help if those signs occur.

We conclude that Jellinger has current legal skills and knowledge, demonstrated by his successful completion of the professional responsibility exam, satisfaction of his CLE requirements, and his work as a paralegal. And, although we only prohibited Jellinger from applying for reinstatement for two years, it has been more than four years since Jellinger's indefinite suspension on December 26, 2002. Thus, although Jellinger's misconduct was very serious, based on the panel's findings of fact (and in the absence of a transcript of the hearing before the panel), we agree with the panel that Jellinger has shown that he is fit to resume the practice of law, and we hold that he should be reinstated.

## II.

Having concluded that Jellinger has met his burden to show that he should be reinstated, we turn next to the issue of what, if any, conditions should continue to apply to Jellinger. The Director argues that a probationary period subject to certain conditions is routine in reinstatement matters, and that the panel's recommendations related to the length of Jellinger's probation and the conditions on the probation are reasonable in this case. Jellinger argues that the conditions recommended by the panel are punitive and inappropriate. In particular, he objects to the length of the probationary period, the condition that he apply for malpractice insurance, and the prohibition on practice as a solo practitioner for the first two years of his reinstatement.

 The goals of the lawyer disciplinary system are to protect the public, the courts, and the legal profession, and to guard the administration of justice. *Jellinger*, 655 N.W.2d at 316. To further these purposes, we have imposed condi-

tions on reinstatement in many previous cases, and often those conditions have been as rigorous, or even more rigorous than the conditions the panel recommended in this case. *See, e.g., In re Anderley,* 696 N.W.2d 380, 386 (Minn.2005) (reinstating Anderley subject to indefinite probation and prohibition on practice as a solo practitioner); *Kadrie,* 602 N.W.2d at 873 (reinstating Kadrie subject to two years of probation and no practice as a solo practitioner for two years); *In re McCreary,* 528 N.W.2d 856, 856 (Minn. 1995) (reinstating McCreary subject to two years of probation and no practice as a solo practitioner). With the relevant goals in mind, we turn to an examination of the three conditions recommended by the panel to which Jellinger objects.

■ First, Jellinger objects to the length of the probationary period recommended by the panel. We conclude that the panel's recommendation is in accord with the probationary periods we have imposed in other cases. *See, e.g., In re Maki,* 536 N.W.2d 631, 631 (Minn.1995) (reinstating lawyer and placing him on five years' probation). In light of Jellinger's disciplinary history, four years of probation is appropriate to ensure that Jellinger gets the supervision and experience necessary to adequately protect the public, the courts, and the legal profession from further misconduct.

■ Second, Jellinger objects to the panel's recommendation that he be required to apply for malpractice insurance. We have imposed this as a condition in other cases. *See In re Schaefer,* 711 N.W.2d 467, 467 (Minn.2006); *In re Schutter,* 489 N.W.2d 233, 233 (Minn.1992). We likewise conclude it is appropriate in this case, if Jellinger engages in solo practice, to accomplish the goals of the lawyer disciplinary system.

■ Third, Jellinger objects to the panel's recommendation that he be prohibited from engaging in the solo practice of law for two years. Jellinger argues that because he is a 59–year–old attorney with a disciplinary history, he will have difficulty attaining gainful legal employment. The Director notes that we have in past reinstatement cases imposed a prohibition on solo practice. *See, e.g., Anderley,* 696 N.W.2d at 386; *Kadrie,* 602 N.W.2d at 873; *McCreary,* 528 N.W.2d at 856. But in the cases the Director cites, the prohibition on solo practice does not appear to have been contested, as it is here.

The panel's recommendation prohibiting solo practice was likely based on an assumption that Jellinger would find employment in a law firm or corporate setting. Given that Jellinger committed misconduct while he was engaged in solo practice it serves the goals of the disciplinary system to condition Jellinger's return to solo practice upon reinstatement. If however, as Jellinger argues, he is unable to attain legal employment in a law firm or as in-house counsel, then a prohibition on solo practice will in effect operate as a continuation of his suspension rather than a reinstatement. The purpose of the attorney discipline system is not to punish the wrongdoer but to protect the public. *In re Plummer,* 725 N.W.2d 96, 98 (Minn.2006). We have said that "a disbarred attorney who meets the heavy burden of demonstrating [his] rehabilitation will be reinstated." *In re Ramirez,* 719 N.W.2d 920, 924 (Minn.2006) (quoting *Anderley,* 696 N.W.2d at 385). In this case, we have concluded that Jellinger has carried this burden, and he is entitled to reinstatement. Thus, while it is appropriate to place certain conditions on his reinstatement, the effect of the conditions should not be to extend his suspension.

There is insufficient evidence in the record to substantiate Jellinger's claim that it will be difficult or impossible for him to find gainful legal employment in any context other than solo practice. We conclude, however, that if Jellinger can demonstrate to the Director's satisfaction that he cannot find other legal employment, then he may engage in the practice of law as a solo practitioner, subject to intensive supervision as set forth below.

We therefore order that Jellinger is reinstated to the practice of law and placed on probation for a period of four years, subject to certain conditions. The nature of the supervision during probation shall depend on the setting in which Jellinger practices law. The conditions of Jellinger's probation are as follows:

(a) Jellinger shall cooperate fully with the Director's Office in its efforts to monitor compliance with this probation. Jellinger shall promptly respond to the Director's correspondence by the due date. Jellinger shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, Jellinger shall provide authorization for release of information and documentation to verify compliance with the terms of this probation.

(b) Jellinger shall abide by the Minnesota Rules of Professional Conduct.

(c) Jellinger shall continue his current mental health treatment program, under which he is now seen on an as-needed basis, and shall follow all recommendations of his treating professional.

(d) If Jellinger engages in the practice of law other than as a solo practitioner, he shall do so subject to supervision, until the end of the probationary period, by a licensed Minnesota attorney, who may be employed by the same entity as Jellinger. The attorney shall be appointed by the Director to monitor Jellinger's compliance with the terms of this probation. Jellinger shall notify the Director as soon as practicable of his intention to engage in the practice of law other than as a solo practitioner. At the same time Jellinger notifies the Director of his intention to engage in the practice of law other than as a solo practitioner, Jellinger shall provide to the Director the names of at least two attorneys who have agreed to be nominated as his supervisor. If, after diligent effort, Jellinger is unable to locate a supervisor acceptable to the Director, the Director will locate the supervisor. Jellinger shall cooperate fully with the supervisor in his or her efforts to monitor Jellinger's compliance with this probation. The supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as the Director may reasonably request.

(e) Jellinger shall not engage in solo practice for the first two years of the probationary period unless Jellinger demonstrates to the satisfaction of the Director that he cannot find other employment as an attorney. If Jellinger engages in the practice of law as a solo practitioner at any time during the probationary period, he shall be subject to the following conditions for two years or until the end of the probationary period, whichever occurs sooner:

(i) Jellinger shall notify the Director at least 30 days before engaging in the practice of law as a solo practitioner.

(ii) Jellinger shall be supervised by a licensed Minnesota attorney, appointed by the Director to monitor Jellinger's compliance with the terms of this probation. At the same time Jellinger notifies the Director of his intention to

open a solo practice, Jellinger shall provide to the Director the names of at least two attorneys who have agreed to be nominated as his supervisor. If, after diligent effort, Jellinger is unable to locate a supervisor acceptable to the Director, the Director will locate the supervisor. Jellinger shall make active client files available to the Director upon request. (iii) Jellinger shall cooperate fully with the supervisor in his or her efforts to monitor compliance with this probation. Jellinger shall contact the supervisor weekly, either in person or by telephone, and shall schedule a minimum of one in-person meeting per month. Jellinger shall submit to the supervisor an inventory of all active client files at least one week before each in-person meeting. With respect to each active client file, the inventory shall disclose the client name, type of representation, date opened, most recent activity, next anticipated action, and anticipated closing date. In addition, the inventory shall contain information about any retainers accepted and any trust account transactions affecting each such client. At least quarterly, the supervisor shall review a random sample of Jellinger's open files. In a general way, Jellinger shall keep the supervisor aware of the financial success or difficulties being faced by the practice and Jellinger's plans to address those matters. The supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as may reasonably be requested by the Director.

(iv) Jellinger shall initiate and maintain office procedures that ensure (1) that there are prompt responses to correspondence, telephone calls, and other important communications from clients, courts, and other persons interested in matters he is handling, and

(2) that Jellinger regularly reviews all files and completes legal matters on a timely basis.

(v) At the same time Jellinger notifies the Director of his intention to engage in the solo practice of law, Jellinger shall provide to the Director a written plan outlining office procedures designed to ensure that Jellinger complies with the requirements of this probation. Jellinger shall also provide the Director with an updated business plan, and shall provide the updated business plan and office procedures plan to his supervisor, once appointed.

(vi) Jellinger shall enter into a written retainer agreement with each client, which shall be signed by Jellinger and the client and which shall comply with Rule 1.5(b), Minn. R. Prof. Conduct (MRPC), and Rule 1.15(b), MRPC.

(vii) Jellinger shall maintain law office and trust account books and records in compliance with Rule 1.15, MRPC. These books and records shall include the following: client subsidiary ledger, checkbook register, monthly trial balances, monthly trust account reconciliation, bank statements, cancelled checks, duplicate deposit slips and bank reports of interest earned, service charges, and interest payments to the Lawyers Trust Account Board. Such books and records shall be made available to the Director at such intervals as the Director deems necessary to determine compliance. Jellinger shall not maintain a trust account without a co-signer acceptable to the Director, whose signature shall be required on each trust account check.

(viii) Jellinger shall initially limit his practice to no more than 20 open files and shall thereafter increase his case load only with the approval of his supervisor and the Director.

(ix) Jellinger shall apply for malpractice insurance with coverage, limits, and an insurance company approved by the Director. Jellinger shall not be required to purchase malpractice insurance if he can demonstrate to the Director that it is unavailable or unduly expensive.

(f) Failure to comply with any of the conditions of this probation shall be grounds for revocation of probation and temporary suspension.

It is so ordered.