**In re Petition for REINSTATEMENT OF David A. SINGER, a Minnesota Attorney, Registration No. 101473.**

No. A05–1136.

Supreme Court of Minnesota.

July 26, 2007.

David A. Singer, St. Louis Park, MN, Appellant Pro Se.

Martin A. Cole, Director of the Office of Lawyers, Professional Responsibility, Timothy M. Burke, Senior Assistant Director, St. Paul, MN, for Respondent.

## OPINION

PER CURIAM.

David A. Singer filed a petition for reinstatement following his indefinite suspension from the practice of law. A panel of the Lawyers Professional Responsibility Board recommended against Singer's reinstatement, concluding that Singer had failed to provide clear and convincing evidence that he has satisfactorily addressed his wrongful conduct or the motivations for that conduct. The panel also concluded that Singer failed to provide clear and convincing evidence that, if reinstated, misconduct is not likely to occur. The Director of the Office of Lawyers Professional Responsibility supports the panel's recommendation. We conclude that Singer has not shown by clear and convincing evidence that he is entitled to be reinstated to the practice of law; therefore, we deny his petition for reinstatement.

In April 1974, petitioner David A. Singer was admitted to practice law in Minnesota. After his admission, Singer practiced with several small law firms in a variety of practice areas, including personal injury, employment, family, and appellate law. In 1995, Singer began a solo practice, which he maintained until 2001, when he was suspended from the practice of law.

Singer's disciplinary history began in 1990, when he was admonished for failing to return a client's phone calls. In 1993, he was admonished a second time for failing to communicate with clients for several months and failing to represent those clients diligently. The circumstances leading to Singer's suspension began in November 1998, when one of Singer's clients filed a complaint against him with the Office of Lawyers Professional Responsibility. Pursuant to an investigation, the Director of the Office of Lawyers Professional Responsibility requested Singer's client trust account records, dating back to 1995. When Singer provided the records, he identified several inappropriate

withdrawals he made from his client trust account.

Following an audit of Singer's client trust account, the Director found that Singer had inappropriately withdrawn over $50,000 since 1995, with individual withdrawals ranging from $150 to $5,000. The Director found that Singer had engaged in a pattern of taking client funds and using them for periods of days to weeks or more, and then repaying the trust account by depositing other clients' settlements into the account or leaving all or a portion of his earned fees in the account to rectify the amount he had taken. During the audit period, there was a continuous shortage in Singer's trust account, ranging from $450 to over $16,000. Among the client funds Singer misused was a $22,500 settlement belonging to his aunt, in which Medicare claimed a subrogation interest. Although Singer's action never resulted in a trust account deficit, he misappropriated his aunt's settlement funds for over one year and the portion of the funds later determined to belong to Medicare for over three years. In addition to his pattern of misappropriation, Singer failed to keep and provide proper records for his trust account, including monthly trial balances and reconciliations. Despite the foregoing conduct, Singer certified on his annual registration statements that he properly maintained his trust account books and records.

The Director's investigation led to state and federal criminal charges against Singer. Singer subsequently pleaded guilty to felony theft in state court for misappropriating client funds in connection with his use of his aunt's settlement proceeds. In federal court, he pleaded guilty to three counts of failing to file federal individual income tax returns for the years 1996–98. Singer also failed to timely file Minnesota individual income tax returns for those same years, eventually filing his state taxes together in December 2000. Singer admitted to the Director that his conviction for misappropriation of client funds and the foregoing state and federal tax violations breached the Minnesota Rules of Professional Conduct. As a result of these violations, Singer stipulated with the Director to an indefinite suspension from the practice of law with no right to apply for reinstatement for three years. We accepted this recommended disposition. *In re Singer,* 630 N.W.2d 404, 404–05 (Minn. 2001).

Since his suspension, Singer has engaged in both legal and non-legal employment. Nine different lawyers have hired Singer to perform temporary, non-attorney legal work on separate occasions, predominantly consisting of drafting, but not signing, appellate briefs. Singer disclosed to each of these employers that he was suspended from the practice of law. Singer has most recently been employed outside the legal field.

In June 2005, almost four years after his suspension, Singer filed a petition for reinstatement. Following a hearing, a panel of the Lawyers Professional Responsibility Board concluded that Singer had met many of the conditions to reinstatement imposed by our court: completion of state and federal criminal probation; compliance with Rule 26, Rules on Lawyers Professional Responsibility (RLPR); completion of the professional responsibility examination; satisfaction of the continuing legal education requirements; proof of timely filing of state and federal tax returns since 2000 and payment of prior overdue income taxes; and payment of costs imposed by this court. The panel also concluded that Singer proved by clear and convincing evidence that he possesses current legal skill and knowledge.

Regarding the final condition imposed by our court, proof of Singer's psychological fitness to practice law, Singer had been previously diagnosed with generalized anxiety disorder and bipolar disorder but stated that he has been symptom free for some months and fully functional for at least three years. Singer further stated that his medications for treating these disorders are effective, and he remains under the care of several doctors to continue to manage the disorders. The panel concluded that Singer's bipolar and generalized anxiety disorders are in full remission.

At the hearing, Singer testified that he accepted responsibility for his past actions, admitting that he made a conscious decision to steal money. Singer stated that he had previously tried to rationalize and minimize what he had done, knowing that he could replace the money in the trust account when it became due, but after his prosecution in federal court, he understood that what he did constituted theft. After engaging in conversations with family members and attending seminars that dealt with lawyer misconduct and mental illness, Singer testified that he has become a moral person. Singer stated that he can no longer rationalize his misconduct.

Singer presented the testimony of four witnesses who knew about his past actions leading to his suspension. Each of these witnesses recommended that Singer be reinstated. One witness had been Singer's client at various times since the late 1970s. This witness testified that he considered Singer to be an honest person despite having stolen money in the past and noted that Singer had accepted responsibility for what he had done and expressed remorse.

Two of Singer's witnesses were lawyers who had hired Singer to assist them with legal work during Singer's suspension. The first lawyer hired Singer to write briefs in workers' compensation cases and testified that Singer's work was very good and that he would not hesitate to hire Singer in the future. The second lawyer testified that she met Singer when Singer was helping to wind up the law practice of a mutual friend, who had died shortly before Singer was suspended. The lawyer stated that Singer did an excellent job taking care of their friend's practice and that she later hired Singer to work on a brief, which resulted in a satisfactory work product.

Singer's fourth witnesses was E.W., a lawyer recruiter. E.W. testified that she shared a mutual friend with Singer, and the friend had recently died in a nursing home. E.W. testified that before the mutual friend's death, Singer volunteered to help manage the friend's personal affairs and also assumed power of attorney at the friend's request. E.W. testified that she was impressed by Singer's diligence and willingness to help and as a result, recommended that he be reinstated.

As an exhibit for the panel's consideration, Singer submitted a May 2000 transcript from his disciplinary hearing which contained testimony given by a fellow lawyer. The lawyer represented a party opposing Singer's client on a case that began in the late 1970s and continued for almost a decade. The lawyer described Singer as a professional and a zealous advocate and noted that he regularly referred clients to Singer. This lawyer was aware of Singer's trust account violations.

The panel's findings of fact included statements from other witnesses, apparently taken directly from the Director's report.[1] One witness knew Singer from

---

1. The Director is required to investigate a petition for reinstatement and submit a report to the panel, *see* Rule 18(b), RLPR, but the witnesses in that report who do not testify at a

childhood and retained him as a lawyer but noted that Singer was a procrastinator. Another witness volunteered with Singer for the Hemophilia Foundation of Minnesota/Dakotas. This co-volunteer gave examples of Singer's "humanitarian heart" and stated that she would consider retaining Singer as a lawyer if he was reinstated.

The panel's findings included three instances of Singer acting in a fiduciary capacity. All three instances occurred after Singer's suspension and were taken from the Director's report, except E.W.'s testimony described above. Attorney David Kraker was a court-appointed guardian for the aforementioned mutual friend of Singer and E.W. Kraker concluded that Singer's role as power of attorney for the friend, which included handling his finances, "was time consuming and he did a B+ or A job." Attorney Maurice Lazarus was the attorney for the estate of K.W. Lazarus stated that Singer was the personal representative of K.W.'s estate before his suspension, and he continued in that capacity following his suspension but did not handle the estate's funds. Singer also acted as the personal representative of and pro se attorney for his mother's estate. The panel made no findings that reflected negatively on Singer regarding these fiduciary roles.

At the hearing, the Director presented the testimony of two persons who were employed by Community Mediation Services, Inc. (CMSI) in 2005. In February 2005, Singer applied to CMSI's mediation training program in order to become a volunteer mediator. The two employees testified that Singer never informed either of them that he was suspended from the practice of law or that he had criminal convictions. But both employees also admitted that such information was never solicited, either through the application process or through their personal contact with Singer. Singer testified that he did inform one of the employees that he was suspended from the practice of law after becoming aware, during a training session, that CMSI mediators had to meet the qualifications required by our court for the state's roster of neutrals.[2] The employee denied that this conversation occurred. Although Singer completed CMSI's mediator training program, he was not accepted as a volunteer mediator because CMSI determined that he could not adequately represent the organization.

The Director also presented evidence of Singer's management of his personal finances since his suspension, which evidence included payments due to CMSI. Singer was tardy in making a $75 payment for the CMSI training program. In addition, Singer owed a $35 payment to a separate organization for a training session in conjunction with the CMSI training program, for which Singer provided a check that was returned because of insufficient funds in his account. Singer paid the full amount for the training program and the individual training session, in addition to a $10 donation to CMSI, more than six months after the payments were due.

The Director also presented evidence obtained through an investigation of two of Singer's bank accounts from December 2004 to May 2006. This investigation revealed a pattern of account misuse that resulted from insufficient funds (NSF) in those accounts. Review of the first account, for the period between January 26,

---

subsequent hearing are not placed under oath and are not subject to cross-examination. We are mindful of this fact and weigh such statements accordingly.

**2.** Under our court's rules, neutrals may not provide services while their professional license is under suspension. Minn. Gen. R. Prac. 114.12(a).

2005, and August 12, 2005, revealed that Singer issued eight NSF checks totaling $6,671, issued nine NSF electronic check payments totaling $592, and made four ATM withdrawals when the account was overdrawn. In September 2005, the bank closed this account.

The Director reviewed a second bank account, and for the period between March 9, 2005, and February 23, 2006, Singer issued 10 NSF checks totaling $2,234, issued two NSF electronic check payments totaling $413, and made four ATM withdrawals when the account was overdrawn. Regarding these money management issues, Singer testified that even though there were insufficient funds to cover the checks, few of the checks actually bounced, and the bank was predominantly covering the checks and charging him overdraft fees. Singer further testified: "This was how I was surviving, but I wasn't paying real close attention to the magnitude of the number of checks that they were paying." Singer noted that on three occasions, he wrote checks knowing that he did not have sufficient money in his account to cover payment. Singer denied that the Director's investigation caused him to be more diligent with his bank accounts. He said that instead, it was his lack of employment during the relevant time periods that caused the problems. At the time of the hearing, Singer was approximately $12,000 in debt.

The panel found that Singer "rationalized that his checks would be covered by the bank," "[i]n essence, * * * view[ing] his actions as creating a short-term loan," similar to how he viewed his misappropriation of client money in the late 1990s. The panel found that "[o]nly after [Singer] learned that the Director was reviewing his personal finances did [his] management of them improve." The panel concluded that Singer "recognized he had other op-

tions than issuing the worthless checks, but chose not to utilize those options." Based on these findings, the panel recommended that Singer's petition for reinstatement be denied because in spite of significant improvements, Singer did not prove by clear and convincing evidence "that he has satisfactorily addressed his wrongful conduct or the motivations for that conduct" or "that misconduct is not apt to occur."

In his petition to our court, Singer argues that he has demonstrated the moral change necessary to be restored to a position of public trust and to be reinstated. The Director disputes Singer's argument and requests that we adopt the recommendation of the panel and deny Singer's petition for reinstatement.

We have held that an attorney applying for reinstatement "must establish by clear and convincing evidence that she or he has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited." *In re Jellinger*, 728 N.W.2d 917, 922 (Minn.2007) (internal quotation marks omitted). In addition to moral change, we consider: (1) the petitioner's recognition of the wrongfulness of his conduct; (2) the length of time since the original misconduct and the suspension; (3) the seriousness of the original misconduct; (4) the existence of physical or mental illness or pressures that are susceptible to correction; and (5) the petitioner's intellectual competency to practice law. *Id.* We independently review the entire record to determine whether an attorney should be reinstated and consider, but are not bound by, the panel's recommendations. *In re Kadrie*, 602 N.W.2d 868, 870 (Minn.1999).

*Psychological Fitness*

Singer appears to have met all of the conditions for reinstatement that we

imposed in our suspension order, as discussed above. The only condition in the order that is discussed further in briefing to our court is Singer's proof of psychological fitness to practice law. Singer maintains that the record indicates that he is stable and in remission, as demonstrated by evidence from two health care providers. The record contains a letter dated March 17, 2005, from a psychologist who has treated Singer since September 1999, and she states that Singer's "psychiatric condition should in no way interfere with his reinstatement as an attorney." The panel concluded that Singer's bipolar and generalized anxiety disorders are in full remission. The Director does not appear to dispute the panel's finding. We conclude that Singer has demonstrated that he is psychologically fit to practice law.

*Moral Change*

■ Singer argues that he has demonstrated moral change in his financial management, warranting his reinstatement into a position of public trust. Singer states that he "has held or gained the trust of people with whom he has worked before and during his suspension, unshaken by the revelation of his wrongdoing." Singer asserts that he has demonstrated the moral change that we have required in other cases, such as *In re Ramirez*, 719 N.W.2d 920, 925 (Minn.2006), where we concluded that the petitioner for reinstatement had "undergone a moral change such that clients [could] have complete confidence in her competence and morality." Singer cites the statements of those who testified on his behalf, noting that they considered Singer an honest and trustworthy person and many stated that they would hire him as a lawyer and entrust him with money. Singer also notes that his three fiduciary roles reflect positively on his moral fitness. Singer further states that the testimony of the lawyer who was an adversary in the 1970s and 80s "serves as a baseline of [Singer's] honesty" because the two were adversaries on cases dating back to when Singer began his career.

Regarding the financial management of his personal finances while suspended, Singer argues that his "admitted moral and legal derelictions in the handling of his personal finances [do] not negate that he has proven sufficient moral change to warrant reinstatement." Singer states that after reviewing other Minnesota lawyer discipline cases in preparation for his brief to this court, he now understands that issuing NSF checks is illegal and immoral, even in those circumstances when a bank honors such checks. Singer further asserts that his financial problems, although not morally or legally excusable, related to his "lapse of judgment during a period of severe financial stress." Singer states that we have not required moral perfection, noting cases where we reinstated lawyers "whose conduct since disbarment was not 'without blemish,' " and he cites *Ramirez*, 719 N.W.2d 920, as an example.

In *Ramirez*, we conditionally reinstated petitioner Ramirez, who had previously been disbarred for submitting improper requests for reimbursements of travel expenses to her employer. *Id.* at 921–22. In February 2001, while disbarred, Ramirez accepted a research and administrative position with the United States Bankruptcy Court in Puerto Rico. *Id.* at 922. After Ramirez began the position with the bankruptcy court, she completed a job application, on which she answered two questions in a misleading fashion, apparently to avoid referencing her past misconduct. *Id.* at 923. Before Ramirez applied for reinstatement in Minnesota, she notified the bankruptcy court of her disbarment, and the chief deputy of the court concluded that Ramirez accepted responsibility for her actions and the application was not a

basis for the court to terminate her employment. *Id.* at 923–24.

We acknowledge that the petitioner in *Ramirez*, as Singer argues, was not "without blemish," but there are facts that distinguish this case from Singer's. *Ramirez* disclosed and seemingly rectified her dishonesty with her employer before she applied for reinstatement. In contrast, Singer's petition for reinstatement was filed on June 6, 2005, and based on our review of the record, *after* Singer applied for reinstatement, he engaged in at least 14 bank transactions with insufficient funds in his respective accounts, was assessed at least 46 continuous overdraft fees, was assessed at least 15 overdraft charges, and was assessed at least 12 returned check charges. We do not suggest that the only evidence relevant to our decision is a petitioner's conduct after he applies for reinstatement, but a petitioner must show, by clear and convincing evidence, that he is morally fit for the practice of law. The fact that Singer's pattern of financial mismanagement continued even after applying for reinstatement hinders his ability to meet this burden of proof.

■ The Director's audit of Singer's personal bank accounts encompassed an 18–month period, from December 2004 through May 2006. During that time, Singer made a total of 37 transactions without sufficient funds in his respective bank accounts. Engaging in NSF transactions violates Minn. R. Prof. Conduct 8.4(c), which classifies "conduct involving dishonesty, fraud, deceit, or misrepresentation" as professional misconduct. *See, e.g., In re Pokorny*, 453 N.W.2d 345, 347 (Minn.1990).

The Director properly connects Singer's financial mismanagement while suspended with his trust account issues that led to his suspension. The Director notes that in the late 1990s, Singer was suffering financially and instead of finding other methods for addressing his hardships, he covered his expenses by misappropriating client funds, rationalizing his conduct as short-term loans. Similarly, when Singer was suffering financially during his suspension, he covered his expenses by issuing NSF checks, rationalizing his behavior through his intent to repay the shortages in his account and pay the applicable overdraft fees.

The Director distinguishes Singer's behavior from that of the petitioner in *Jellinger*, whom we reinstated. Similar to Singer, Jellinger was suspended for misappropriating client funds, among other misconduct, and he also struggled with mental health issues. 728 N.W.2d at 919–20. But unlike Singer, there was no evidence presented that Jellinger demonstrated poor financial decision-making while suspended, and Jellinger also presented testimony of a lawyer who agreed to be a co-signer on his trust account. *Id.* at 920–21. The Director argues that because Singer has failed to rectify his financial irresponsibility, Singer's petition for reinstatement is distinguishable, and Singer should be denied reinstatement. We agree that Singer's financial mismanagement during his suspension is serious and undermines his ability to show by clear and convincing evidence that he has "undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited." *Id.* at 922 (internal quotation marks omitted).

Singer argues that little or no weight should be placed on the testimony of the two CMSI employees, insofar as their testimony bears on his moral fitness. Singer notes that he had little contact with these two people, relative to the witnesses that testified on his behalf. Singer also notes that the panel's findings create an inference that he fabricated a conversation with

one of the employees, in which he disclosed to her that he was suspended from the practice of law. The Director asserts that "the Panel made a credibility determination that petitioner's testimony was not credible when it found that petitioner did not disclose his suspended status."

Based on our review of the record, both parties fail to properly characterize the panel's findings regarding the CMSI employee. The panel only recorded the conflicting testimony of Singer and the CMSI employee at the hearing, making no findings or inferences about whether Singer actually disclosed his suspended status to the employee or CMSI. Regardless of whether Singer disclosed his suspended status to CMSI, it is uncontested that Singer was more than six months tardy in paying fees for the mediation program. This delay in payment further supports the conclusion of the panel that Singer has not proven by clear and convincing evidence "that he has satisfactorily addressed his wrongful conduct." Based on Singer's financial mismanagement during his suspension period, including after he filed his petition for reinstatement, we agree with the panel's conclusion that Singer should not be reinstated to the practice of law.

For all the foregoing reasons, we conclude that Singer has not established by clear and convincing evidence that he has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited.

Petition for reinstatement denied.