In re Petition for REINSTATEMENT to the Practice of Law OF Richard J. KADRIE, Petitioner.

No. C5–90–383.

Supreme Court of Minnesota.

Dec. 9, 1999.

Jerry Straus, Minneapolis, for petitioner.

Edward J. Cleary, Director, Betty M. Shaw, Senior Assistant Director, St. Paul, for Office of Lawyers Professional Responsibility.

## OPINION

PER CURIAM.

This appeal comes to us on the Lawyers Professional Responsibility Board panel's January 14, 1999 recommendation to deny Richard J. Kadrie's petition for reinstatement. On June 6, 1990, petitioner Kadrie was indefinitely suspended for forging a cashier's check, misappropriating client funds and falsely stating that he held the funds in trust for a client. *See In re Kadrie*, 456 N.W.2d 717, 718–19 (Minn. 1990). The indefinite suspension order did not allow petitioner to petition for reinstatement for a minimum of five years. *See id.* at 719. Prior to his suspension, petitioner had been placed on probation for failing to maintain books and records for client trust funds and law office funds; for falsely certifying that he maintained such books and records; for failing to provide an accountant's report to the Director

of the Office of Lawyers Professional Responsibility in a timely manner; for failing to produce books and records upon request by the director; and for failing to cooperate with the supervising attorney appointed by the Lawyers Professional Responsibility Board (LPRB). *See id.* at 718.

Pursuant to Rule 18 of the Rules on Lawyers Professional Responsibility, Kadrie filed a petition for reinstatement to the practice of law. The director performed an investigation and submitted a report to a three-member LPRB panel. The panel held a hearing on February 26, 1997, and heard testimony from petitioner and a consulting psychologist, Dr. Paul Reitman. The panel concluded that petitioner had not proven by clear and convincing evidence that he had "undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited." *In re Swanson*, 343 N.W.2d 662, 664 (Minn.1984) (*Swanson I*). The panel then issued its findings of fact and conclusions, and recommended against reinstatement. Oral arguments were scheduled in this court, but before they could be held a new complaint was filed against petitioner with the director. The proceedings were remanded to the panel. The director investigated the complaint and submitted a supplemental report to the panel.

A second panel hearing was held on October 9, 1998. The panel found that the new complaint had not been proven by clear and convincing evidence. However, the panel concluded that petitioner's failure to satisfy a civil judgment entered against him in 1991 for six years evidenced that he did not understand the wrongfulness of his conduct and had not undergone a moral change. Further, the panel concluded that petitioner had failed to demonstrate that he possessed the skills and knowledge needed to practice law competently, and again recommended that his petition for reinstatement be denied.

We conclude that neither of the panel's conclusions are supported by the record.

Accordingly, we reject the panel's recommendation that petitioner's application for reinstatement be denied and reinstate petitioner subject to the conditions set forth below.

I.

█ In reinstatement cases this court conducts an independent review of the entire record before making its determination. *See In re Maki*, 536 N.W.2d 631, 632 (Minn.1995). While the panel's recommendation is duly considered, it is not binding. The responsibility for determining whether a petitioner will be reinstated rests with this court. *See, e.g., In re Williams*, 433 N.W.2d 104, 104 (Minn.1988) (reinstating petitioner where the panel recommended denial).

█ The standard for determining whether a disbarred or suspended attorney should be reinstated focuses on whether the attorney has demonstrated by clear and convincing evidence that he has undergone a moral change. *See In re Wegner*, 417 N.W.2d 97, 98 (Minn.1987). This moral change must be such that if the petitioner were reinstated, "clients could submit their most intimate and important affairs to him with complete confidence in both his competence and fidelity." *In re Herman*, 293 Minn. 472, 476, 197 N.W.2d 241, 244 (1972). Evidence of a moral change "must come not only from an observed record of appropriate conduct, but from the petitioner's own state of mind and his values." *In re Swanson*, 405 N.W.2d 892, 893 (Minn.1987) (*Swanson II* ).

█ However, evidence of moral change is not our only consideration. Other factors bearing on whether a petitioner should be reinstated are: (1) petitioner's recognition of the wrongfulness of his conduct, *see Swanson II*, 405 N.W.2d at 893; (2) the length of time since the misconduct and disbarment or suspension, *see In re Hanson*, 454 N.W.2d 924, 925 (Minn.1990); (3) the seriousness of the original misconduct, *see In re Peterson*, 274 N.W.2d 922,

926 (Minn.1979); (4) the existence of physical or mental illness or pressures that are susceptible to correction, *see Wegner*, 417 N.W.2d at 98–99; *In re Ossanna*, 288 Minn. 541, 542, 180 N.W.2d 260, 261 (1970); and (5) petitioner's intellectual competency to practice law, *see In re Strand*, 259 Minn. 379, 381, 107 N.W.2d 518, 519 (1961).

█ The panel's conclusion that petitioner has not demonstrated moral change by clear and convincing evidence is supported primarily by its finding that petitioner

has not acted to rectify the harm caused by his misconduct, nor to atone for the moral failure it represented. Until the initial hearing in this matter, he resisted payment of damages awarded to his former client. After the initial hearing, he satisfied the * * * judgment, but the circumstances do not indicate a desire to rectify or atone for harm he caused.

The damages in question arose out of a 1991 counterclaim against petitioner by a former client. Petitioner sued the client for attorney fees stemming from petitioner's representation of the client in a real estate transaction. The client brought a counterclaim for fraudulent misrepresentation and negligence. The former client was also the complainant in an earlier action which led to petitioner's suspension. While petitioner's claim was dismissed due to his misconduct, the former client was awarded damages of $33,200.95 in her counterclaim. Though the judgment was rendered in 1991, petitioner did not satisfy it until 1997. The panel's conclusions indicate that petitioner's delay in satisfying the judgment evinced that he had not recognized the wrongfulness of his actions, and thus had not demonstrated clear and convincing evidence of moral change. The record shows, however, that petitioner satisfied the judgment as soon as he was financially able to do so. An affidavit submitted by petitioner's employer with attached W–2 payroll records demonstrates that petitioner could not have satisfied the

judgment until 1997, when he received a large bonus. Contrary to the panel's findings, the record contains clear and convincing evidence that when able the petitioner acted to rectify the harm he caused his former client.

Likewise, the record shows that petitioner has recognized the wrongfulness of his actions. Petitioner repeatedly expressed remorse for his misdeeds at both panel hearings. While the panel found in the first hearing that petitioner "testified that he recognizes his misconduct was a serious mistake, for which he is remorseful," it still concluded that he "exhibits a limited understanding of the wrongfulness of his conduct. His remorse appears to be focused on the consequences to himself rather than on the harm it caused to his clients and to the integrity of the legal profession." While this court defers to the credibility assessments of lower courts and tribunals, in this case the panel's assessment seems to be rooted in its concern about the judgment that remained unsatisfied for six years. As stated above, the six-year delay was due more to petitioner's financial situation than to a lack of remorse. In fact, the record contains unrefuted evidence of petitioner's expressions of remorse,[1] as well as Dr. Reitman's corroborating testimony that petitioner repeatedly expressed regret for his actions in their sessions together. The record shows that petitioner has demonstrated clear and convincing evidence of his recognition of and repentance for the wrongfulness of his actions.

The length of time since petitioner's misdeeds and suspension also weighs in favor of his reinstatement. While our indefinite suspension order allowed petitioner to apply for reinstatement after five years, *see* *Kadrie*, 456 N.W.2d at 719, more than nine years have passed since his suspension. It should be noted that a five-year suspension exceeds in duration most discipline this court has ordered in cases concerning conduct of comparable gravity. For example, in *In re Mack*, 476 N.W.2d 893 (Minn. 1991), this court considered reinstatement of an attorney who had, among other things, misappropriated client funds, knowingly filed false interrogatory answers, and filed false tax returns. *See id.* at 893. The attorney was suspended indefinitely without eligibility for reinstatement for at least 21 months. *See id.* at 894. Similarly, in *In re Porter*, 472 N.W.2d 654 (Minn.1991), an attorney who falsified will documents, swore falsely under oath and misappropriated client funds was suspended indefinitely without eligibility for reinstatement for at least six months. *See id.* at 655. We do not claim that petitioner's suspension was too lengthy, only that it was not, in light of this court's precedent, too short.

As to the factor concerning the seriousness of petitioner's misconduct, the panel found at both hearings that the misconduct was serious, as it "involved dishonesty and deceit, betrayal of a client, disregard of professional obligations, and failure to cooperate with discipline processes." The director's brief argues that petitioner's "misconduct struck at the heart of the administration of justice." We do not disagree with the panel's findings or the director's argument. Petitioner's misdeeds were indeed very serious. However, we note that the length of petitioner's suspension was based on the seriousness of his misdeeds. As petitioner has undergone the discipline this court imposed for his actions, those actions, while serious, should not bar his reinstatement.

---

1. Among petitioner's expressions of remorse are the following excerpts, taken from his testimony at the panel hearings: "I was a disappointment to my fellow practitioners and also to the citizens and I realize the severity of that and my responsibility to the people of the State of Minnesota and the other people who practice law"; "I think my conduct was disgraceful and I think I deserved the punishment that I received"; "I'll have concerns for the rest of my life concerning that misconduct. I think it's something I'll never forget."

Next we consider the evidence relating to the existence of physical or mental illness or pressure susceptible to correction. The panel found at both hearings that "[a]lthough alcohol abuse and personality disorder were present, neither explains the misconduct, and their current absence does not assure against future misconduct." This court has noted that the existence of a physical or mental illness, such as alcoholism, that has been corrected or treated is a factor to be considered in reinstatement proceedings. *See, e.g., In re Constantine*, 258 Minn. 582, 584, 103 N.W.2d 196, 198 (1960). Indeed, the importance of addressing such problems in order to protect the public cannot be denied. However, while the panel may be correct in finding that petitioner's present sobriety does not ensure against future misconduct, the successful treatment of his alcoholism does indicate that the circumstances in which the misconduct occurred have changed for the better.

In this case, petitioner suffered from alcoholism at the time of his misconduct. Petitioner provided the panel with two psychological assessments from Dr. Reitman, one from 1996 and one from 1998. In both assessments, Dr. Reitman's clinical opinion was that petitioner is sober and rehabilitated. In addition, petitioner provided a chemical health assessment performed by Vivian Hildebrandt, CCDC–R of the Chemical Health Institute in 1996, which describes petitioner's alcoholism as "In Sustained Full Remission," indicating that he had been sober for at least 12 months prior to assessment. Moreover, the director's representative stated at the close of the first panel hearing that petitioner "has recovered from the serious alcohol abuse that he engaged in in 1990." Petitioner's successful treatment of his alcoholism weighs against the likelihood of his committing further misdeeds.

Petitioner has undergone several other changes in his life since he was suspended in 1990. First, while petitioner was in a difficult financial situation at the time of his suspension, he has been steadily employed by his present employer since 1991 and his income has steadily increased. Second, Dr. Reitman testified at the first panel hearing that prior to his suspension in 1990, petitioner was depressed and stressed by his marital problems. Petitioner and his wife have since divorced, and petitioner is now in a stable relationship. Third, differences in petitioner's scores on personality tests in 1990 and 1996 indicate a dramatic change in his personality.

Petitioner took an MMPI test in 1990, approximately six months after petitioner was suspended. After reviewing the 1990 MMPI results, Dr. Reitman testified at both panel hearings that the results indicated that petitioner suffered from depression at that time. Dr. Reitman testified further that petitioner's elevated score on the psychopathic deviant scale indicated that there was a likelihood that he had a "real personality disorder maladjustment." In contrast, on his 1996 MMPI, administered by Dr. Reitman, petitioner's score on the psychopathic deviant scale "dropped to normal." Dr. Reitman testified that according to the "research on the MMPI with psychopaths on personality disorders, [the psychopathic deviant scale] rarely changes because it's so resistant to rehabilitation." Dr. Reitman concluded that the changed Scale IV score "really confirms, my final impression. This is not a man who has a personality disorder." This change in score indicates that petitioner's "acting out was secondary to his alcoholism and depression and that's what affected his judgment, not a pervasive pattern of character moral madness." Therefore, on this evidence we conclude that the change in petitioner's personality, his successful treatment for alcoholism, and his changed financial and relationship circumstances weigh in favor of his reinstatement.

Finally, the panel found that petitioner "has not demonstrated that he possesses the skills and knowledge needed for [a

corporate] practice." The panel found that petitioner's previous practice was devoted primarily to criminal law, and that he now plans to practice corporate law for his current employer. Further, the panel found that petitioner has "done little to maintain or enhance his legal skills and knowledge" during his suspension.

We have stated in the past that there is no fixed standard in reinstatement proceedings by which we determine a petitioner's intellectual competency to return to practice. For example, in *Strand* this court reinstated a 73–year–old petitioner who had not practiced law for more than 25 years. *See Strand*, 259 Minn. at 381, 107 N.W.2d at 519–20. Concerning his competency to practice law, this court stated that

> [i]t will obviously be difficult to establish intellectual qualifications to practice law after an extensive period of exile from the profession. In such a case it might be advisable for an applicant to make a showing of some systematic effort to familiarize himself with current legal practice. However, there are no definite or formal standards established, and each case must be determined on the basis of a judgment as to the individual involved.

*Id.* at 381, 107 N.W.2d at 519.

In the instant case, petitioner has completed 130 hours of continuing legal education since 1995, which is in excess of the required number of hours. Of the completed hours, 53.5 concerned issues directly related to corporate practice. Moreover, petitioner's job has allowed him to familiarize himself with various aspects of corporate law. The panel found that his job involves "arranging contracts with vendors, assigning legal matters to outside counsel, and handling real estate matters." In *In re Trygstad*, 472 N.W.2d 137, 139 (Minn.1991), this court concluded that the petitioner was intellectually competent to practice law seven years after being disbarred because "he remained acquainted with legal matters during his * * * employment * * *, and over the past few years he has accumulated 100 hours of CLE credits." Similarly, on the facts of this case, we conclude that the petitioner has demonstrated his intellectual competency to return to the practice of law.

## II.

■ Petitioner's misdeeds were very serious. However, Rule 18 of the Rules on Lawyers Professional Responsibility allows for the reinstatement of suspended attorneys. This court has promulgated the criteria that must be satisfied for a petitioner to be reinstated. Here, the record demonstrates that petitioner has undergone a moral change, recognized the wrongfulness of his actions, successfully treated his alcoholism, become gainfully employed, experienced a dramatic change in personality, and is intellectually competent to return to the practice of law. If the evidence in this case is deemed insufficient to allow for petitioner's reinstatement, the rule and its accompanying proceedings would indeed be "a cruel hoax." *Swanson I*, 343 N.W.2d at 664.

We therefore hold that petitioner is entitled to reinstatement, subject to the following conditions:

1. That he be placed on supervised probation for two years;

2. That for two years he practice law only in a corporate setting and not return to private practice;

3. That at any time following his successful completion of two years' probation, petitioner may, by affidavit, request authorization of the court to engage in the solo practice of law. At least one month prior to such request, petitioner shall notify the Director's Office of his intention to seek authorization for solo practice, and the director shall file a responsive affidavit which may, for good cause, request a hearing on the appropriateness of petitioner's return to solo practice;

4. That within 90 days he complete an updated chemical dependency assessment and mental health assessment, and follow the recommendations of the assessments;

5. That he pay the cost of the director's prosecution.

It is so ordered.

RUSSELL A. ANDERSON, J., took no part in the consideration or decision of this case.