In re Petition for DISCIPLINARY AC-
TION AGAINST Kenneth M. HOLK-
ER, a Minnesota Attorney, Registra-
tion No. 46267.

No. A06–896.

Supreme Court of Minnesota.

May 21, 2009.

Edward F. Kautzer, Ruvelson & Kautzer, Chartered, St. Paul, MN, for petitioner attorney.

Martin A. Cole, Director, Craig D. Klausing, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for respondent.

## OPINION

PER CURIAM.

Kenneth M. Holker filed a petition for reinstatement following his indefinite suspension from the practice of law. After a hearing, a panel of the Lawyers Professional Responsibility Board recommended against Holker's reinstatement. The panel concluded that Holker failed to demonstrate by clear and convincing evidence that he had undergone the requisite moral change for reinstatement or recognized that his conduct was wrong. Holker contests the panel's findings in this appeal; the Director of the Office of Lawyers Professional Responsibility supports the panel's recommendation. After independently reviewing the record, we conclude that Holker should not be reinstated to the practice of law because he failed to prove by clear and convincing evidence a sufficient moral change or recognition of wrongful conduct.

Kenneth M. Holker was admitted to practice law in Minnesota in October 1977. Holker established a solo firm after admittance, and he eventually spent 15 years practicing in the areas of estate planning and probate. Before the suspension at issue in this case, Holker had been previously disciplined with five separate admonitions and a public reprimand and probation for state and federal income tax problems. *See In re Holker*, 605 N.W.2d 104 (Minn.2000).

On May 3, 2007, Holker was indefinitely suspended from the practice of law for conduct related to his handling of a probate matter. *See In re Holker*, 730 N.W.2d 768 (Minn.2007). In 1997, a 78-year-old client retained Holker to represent her in her role as the personal representative of her recently-deceased sister's estate. In the course of that representation, Holker committed numerous violations of the Minnesota Rules of Professional Conduct and the Minnesota Rules on Lawyers Professional Responsibility (RLPR).[1] We indefinitely suspended

---

1. Holker's misconduct started with his failure    to timely file estate and income tax returns,

Holker for a minimum of six months. *Holker*, 730 N.W.2d at 776.

On December 27, 2007, Holker filed a petition for reinstatement with the Office of Lawyers Professional Responsibility. The Director's report, in response, acknowledged that Holker had complied with the general preconditions for reinstatement set forth by this court. *See id.* at 776–77. Ultimately, the Director found no misconduct since Holker's suspension and stated that "[i]f the Panel can find by clear and convincing evidence that petitioner acknowledges and appreciates the unprofessional nature of [his] conduct, despite petitioner's belief that he did not engage in some of the misconduct, then the Director has no objection to petitioner's reinstatement."

On July 18, 2008, a panel appointed by the Lawyers Professional Responsibility Board conducted a reinstatement hearing. Holker presented testimony from four witnesses and testified himself.

The first witness, M.E., is an attorney who had practiced law in an office down the hall from Holker from about 2002 to 2006. After 2006, M.E. estimated he saw Holker briefly one or two times a week, with less frequency after Holker's suspension. M.E. testified that he had used Holker as a resource and mentor and that he fully appreciated and trusted in Holker's skills. M.E. had received few details about Holker's suspension, but when the details of Holker's misconduct were disclosed to him, he said his opinion of Holker did not change "because I know him for who he is."

The second witness, J.B., met Holker when they worked together on a case in the late 1980s and early 1990s. In the following years, they consulted each other on professional matters two or three times a year. J.B. was not told most of the details of Holker's suspension until Holker asked J.B. to testify at the reinstatement hearing, at which time J.B. read our disciplinary order. J.B. said he was surprised by the contents of the order and found some findings "so completely out of [Holker's] character as to in some respects not to be believable." J.B. said that while Holker still "takes issue" with some of the findings in his suspension, Holker recognizes that some things should have been done differently. As to whether J.B. had seen a moral change in Holker, J.B. stated: "I think Ken Holker has a bedrock of honesty and integrity. And I would not expect to see any change in Ken Holker."

The third witness, N.P., met Holker in 1982 when they were involved in a mutual transaction with a client. N.P. and Holker worked together and became personal friends in the years that followed, visiting each other once or twice a year. Holker had expressed embarrassment and shame to N.P. about the events. N.P. said that Holker is truly remorseful and had implemented procedures to ensure that nothing

---

and his delinquency in waiting over two years to start the probate proceeding. During the relevant time period, he had no record of working on the file or communicating with the client for long periods of time. He paid himself from estate funds in an amount greater than the estate then owed him for legal fees and expenses. Holker failed to hold those unearned fees in a trust account.

When the client hired a new lawyer, Holker did not respond to requests for the file. When a clerk of the new lawyer picked up the file, the clerk was led to believe he received the complete file; later events, however, turned up documents that had not been included. Holker also failed to fully cooperate with the Director's investigation by not providing documents or contacting the Director when asked to do so.

Finally, Holker submitted various documents to the Director during the investigation of the complaint that were determined by the referee to be fabricated.

similar would happen again. N.P. said that Holker did not blame anyone else for the mistakes, and other than his disagreement with the findings on the document fabrication, Holker accepts responsibility for his misconduct.

The fourth witness, G.O., was a personal friend of Holker's since they were young, although for the past 30 years G.O. has lived and worked in Texas. He usually saw Holker two or three times a year. Holker also worked on several legal matters for G.O. and his family, work with which G.O. said he was very satisfied. Holker had described some of the details of his suspension to G.O., such as the fact that Holker had taken money from his client's trust account as "[Holker's] customer had told him to do." G.O. also took exception with the conclusion in our suspension order that Holker fabricated letters—G.O. instead believed the chain of events that Holker told him, that Holker had simply recreated the documents at a later date.

Holker testified that he would like to be reinstated because he wants to practice law with his son, who was admitted to the bar in 2006. Holker then testified about changes he had made to his law practice. Holker believed that implementing a more advanced electronic tickler system was the most meaningful change—it would "get more eyeballs on each case." Another new policy required that each file be reviewed by at least one person in the office every 30 days.

Holker testified that seeing the complaint that led to his suspension signaled that there were problems with office protocol, and "hard-core" discussions had to happen.

I didn't beat around the bush, I mean, you know, I recognized that stuff was falling through the cracks that shouldn't have fallen through the cracks. And while I'm the guy that signs the checks and as one of the witnesses said, the buck does stop here, you do have a tendency to rely on your support staff on occasion. It's ultimately my responsibility, but I—I expect them to crack the whip if I need to get something done.

Holker also testified:

If I could look at this whole situation that we're all here on today for, the one thing that I think I screwed up on, for lack of a better term, is that I didn't paper the file.... I realize now that it probably would benefit both [the client and me] and I have undertaken to be much more diligent in the innocuous, at times to the client perhaps an irritant, of sending the reminder letters.

When asked what Holker does when clients will not respond, Holker noted that his office had handled about 4,000 estate plans and this one just "got out of control." Holker testified that the relationship with the particular client was also a factor in how he handled the matter professionally: "I didn't feel, at that time, that I needed to beat up on her all the time.... I would leave her with a handwritten page out of my legal tablet on what to do. Now I know I should have gone back or either made a copy of that or followed up." Holker noted that "in 31 years it's only happened once and I just would say it would not happen again."

On the topic of withdrawing payment from his client's trust fund before he earned it, Holker testified that the client had given permission for Holker to take the money, and he "didn't know we had to have it in writing." Holker now understands that fee agreements must describe such details and must be signed, although he maintains that his law office does not normally deal with trust accounts.

Holker continued to argue at the reinstatement hearing that he did not fabricate various documents he gave to the Director during the investigation of the complaint, asserting that his office reproduced the documents at a later time because the file had been damaged. He testified: "I don't want to go back and retry the case, I want to go forward. But I'm not going to sit here and apologize for something I didn't do." On cross-examination by the Director's office, Holker also questioned our conclusions regarding his noncooperation with the Director's office. In the end, however, Holker said he fully acknowledged that he is responsible, he knows what he did was wrong, the problem has been corrected, and the wrongdoing was nobody's fault but his own.

In determining whether Holker had evidenced moral change, the panel focused on (1) whether Holker recognized the nature of his misconduct; (2) whether there was some assurance that the public is protected from future misconduct; and (3) what the character witnesses said about Holker. The panel found that "as to a number of the specific acts of wrongdoing, [Holker] equivocated, minimized the wrongdoing, or sought to shift the responsibility to others." The panel concluded that Holker's testimony indicated that he did not recognize the nature of his misconduct: "More than a year after a suspension, [Holker] was still not clear on what he had done wrong."

The panel acknowledged that Holker had changed some procedures that might help protect the public from future misconduct, such as his plan to use an electronic tickler system and changing his fee agreement. However, the panel concluded that without a clear understanding and acknowledgement of his misconduct, "it is unclear how successful [Holker] will be in avoiding future misconduct."

The panel also found that the character witness testimony failed to prove the necessary moral change. None of the witnesses had extensive contact with Holker since his suspension, and none testified to any observable change in Holker's character since that time. Further, none appeared to believe that a change was needed.

The panel recommended that Holker's petition for reinstatement be denied because Holker had not proven by clear and convincing evidence that he recognized the wrongfulness of his conduct, nor had he demonstrated that he had undergone sufficient moral change justifying his reinstatement to the practice of law. The Director accepted the panel's recommendation and asks us to adopt the recommendation of the panel. Holker argues the panel's findings are clearly erroneous, and asks us to reinstate him to the practice of law.

■ In reinstatement cases, this court independently reviews the entire record to determine whether an attorney should be reinstated. *In re Kadrie,* 602 N.W.2d 868, 870 (Minn.1999). Holker also ordered a transcript of the panel hearing; accordingly, although we duly consider the panel's recommendation, the findings of fact and conclusions are not conclusive. *See* Rule 14(e), RLPR. We will, however, "uphold the panel's factual findings if they have evidentiary support in the record and are not clearly erroneous," and will defer to "the credibility assessments of lower courts and tribunals." *In re Mose,* 754 N.W.2d 357, 360 (Minn.2008).

■ An attorney petitioning for reinstatement must first demonstrate that he has met the general reinstatement conditions imposed in our suspension order. *Id.; see Holker,* 730 N.W.2d at 776–77 (listing preconditions placed on Holker's reinstatement). The panel found, and the

Director does not dispute, that Holker fulfilled the general reinstatement conditions.

The petitioning attorney must then establish, by clear and convincing evidence, that he or she " 'has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited.' " *In re Singer,* 735 N.W.2d 698, 703 (Minn.2007) (quoting *In re Jellinger,* 728 N.W.2d 917, 922 (Minn.2007)). The factors we will consider include: (1) the petitioner's recognition of the wrongfulness of his conduct; (2) the length of time since the original misconduct and the suspension; (3) the seriousness of the original misconduct; (4) the existence of physical or mental illness or pressures that are susceptible to correction; and (5) the petitioner's intellectual competency to practice law. *Id.* at 703. Evidence of moral change comes from an observed record of appropriate conduct by the petitioner, but also must come from "the petitioner's own state of mind and his values." *Kadrie,* 602 N.W.2d at 870 (internal citation omitted). "Stronger proof of good moral character and trustworthiness should be required in the reinstatement case than in the original admission." *In re Reutter,* 474 N.W.2d 343, 345 (Minn.1991) (citing *In re Strand,* 259 Minn. 379, 380, 107 N.W.2d 518, 519 (1961)).

Holker argues that the panel's findings regarding his moral change are all clearly erroneous. As a general rule, this court "will defer to a panel's finding that a petitioner's testimony that he has undergone the requisite moral change is not credible." *Mose,* 754 N.W.2d at 362; *In re Trygstad,* 472 N.W.2d 137, 139–40 (Minn. 1991) (concluding that a panel's findings of genuineness in petitioner's remorse and change in moral character weighed heavily in favor of reinstatement); *but see Kadrie,* 602 N.W.2d at 869–71 (overturning panel's recommendation to deny reinstatement petition based partly on petitioner's repeated expressions of deep remorse and a psychologist's corroborating testimony of this remorse). In *Mose,* we upheld a panel's finding that the petitioner had failed to prove sufficient moral change because of his testimony surrounding the wrongfulness of his conduct. 754 N.W.2d at 363. When asked about intentional lies to clients, petitioner Mose apologized, but then characterized his lies as "inaccurate statements" or "misstatements." *Id.* at 363. We concluded that this indicated "an ongoing unwillingness to recognize the wrongfulness of his conduct." *Id.*

As in *Mose,* our review of Holker's testimony does not compel us to depart from our general deference to the panel's findings on the credibility of a petitioner's testimony. *Id.* at 364. Holker accepted responsibility numerous times during his testimony but, within the same answer, he would also make an excuse or shift the blame to another. For instance, Holker mentioned the "hard-core" discussions his staff needed. Holker talked about the client's failure to follow his instructions, and how failing to "paper the file" was the root of the problem. Holker minimized several aspects of his misconduct, emphasizing that this was only one case out of thousands, and that his office normally does not work with such files. The evidence supports the panel's credibility determinations, and ultimately, its recommendation.

The panel's findings—mainly, Holker's lack of recognition of the wrongfulness of his conduct and the fact that the witnesses do not support a conclusion that Holker has demonstrated evidence of moral change—are supported by the record. Our independent review of the record demonstrates that Holker failed to prove by clear and convincing evidence that he has undergone sufficient moral change as

to render him a fit person to enjoy public confidence and trust, or that he sufficiently recognizes the wrongfulness of his conduct.[2] Therefore, we deny his petition for reinstatement.

Petition for reinstatement denied.

ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.

2. While moral change and recognition of wrongfulness are considered to be only two factors in the overall analysis, we have previously recognized the "decisive" nature of these factors. *See Reutter,* 474 N.W.2d at 345. None of the factors we otherwise consider weighs either for or against Holker's reinstatement.