In re **PETITION FOR REINSTATE-MENT OF** Nuro B. **DEDEFO**, a Minnesota Attorney, Registration No. 309989.

No. A09–691.

Supreme Court of Minnesota.

April 15, 2010.

Eric T. Cooperstein, Minneapolis, MN, for petitioner attorney.

Martin A. Cole, Director, Cassie Hanson, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for respondent.

## OPINION

PER CURIAM.

On July 17, 2008, we indefinitely suspended petitioner Nuro Bedhaso Dedefo from the practice of law, with no right to apply for reinstatement for a minimum of six months. On April 6, 2009, Dedefo filed a petition for reinstatement with the Office of Lawyers Professional Responsibility. After a hearing, a Panel for the Lawyers Professional Responsibility Board (Panel) recommended against Dedefo's reinstatement. The Director accepted that recommendation. Dedefo challenges the recommendation and argues that he has met his burden of proving he is fit to return to the practice of law. We conclude that Dedefo has established his eligibility to be reinstated to the practice of law, subject to a two-year period of supervised probation.

We described the events that led to Nuro Bedhaso Dedefo's suspension in *In re Dedefo*, 752 N.W.2d 523, 526–28, 532 (Minn.2008). We now recount them here. Dedefo is a member of the Oromo ethnic group of East Africa. He came to the United States from his native country of Ethiopia in 1995. Dedefo held a position as a high court judge in Ethiopia. He received threats from the Ethiopian government after he refused to follow orders to imprison or release people without following appropriate procedures. He later received asylum in the United States. Dedefo attended Hamline University Law School and was admitted to practice law in Minnesota in 2001. *Id.* He then began a solo practice where he primarily handled personal injury matters. *Id.*

Dedefo's wife joined him in Minnesota in 1999. *Id.* The couple had serious marital difficulties, and Dedefo physically abused his wife. *See id.* She sought refuge on several occasions in the homes of family friends in 2000 and 2001. Dedefo was extremely angry at her and the three friends because of his cultural belief that a married woman should never spend a night away from home without her husband's permission. He felt that the friends who had sheltered his wife had shamed him and challenged his manhood.

In October 2001, Dedefo filed a lawsuit for defamation, misrepresentation, intentional infliction of emotional distress, and interference with marital relations against the three former friends who had given shelter to his wife. *See id.* at 526–27. He filed the lawsuit knowing that it had no merit, and then intentionally obstructed his own deposition by refusing to answer questions and making improper objections. *See id.* at 527. In response to a defense motion for summary judgment, Dedefo filed a false affidavit that he had drafted and compelled his wife to sign, recanting her accusations of physical abuse. *Id.* Dedefo and his wife divorced in 2005. *Id.*

The Director of the Office of Lawyers Professional Responsibility began an investigation of Dedefo in 2003, following a complaint about an overdraft on his client trust account. *Id.* Four years later, the Director petitioned for disciplinary action against Dedefo for trust account violations, as well as obstruction of access to evidence in the defamation case against his former friends and knowing presentation of a false affidavit to the court in that case. *Id.* Dedefo stipulated to the facts surrounding the trust account violations, but challenged the other allegations. *Id.* In our opinion ordering Dedefo's indefinite suspension from the practice of law, we concluded that

clear and convincing evidence show[ed] that Dedefo negligently misappropriated client funds, commingled client and personal funds, and failed to maintain proper trust account books and records in violation of Minn. R. Prof. Conduct 1.15(a), (b), and (h); incompetently rep-

resented himself in violation of Minn. R. Prof. Conduct 1.1; obstructed another party's access to evidence in violation of Minn. R. Prof. Conduct 3.4(a); knowingly offered evidence that he knew to be false in violation of Minn. R. Prof. Conduct 3.3(a)(3); and engaged in conduct prejudicial to the administration of justice in violation of Minn. R. Prof. Conduct 8.4(d).

*Id.* at 530. We ordered that Dedefo would have "no right to petition for reinstatement for 6 months from the date of [the] opinion." *Id.* at 532.

On April 6, 2009, Dedefo filed a petition for reinstatement with the Office of Lawyers Professional Responsibility. The Director investigated and reported his conclusions to a Panel. The report acknowledged that Dedefo had complied with the general preconditions for reinstatement set forth by this court.[1] The Director interviewed Dedefo and three of his character witnesses, and concluded that the evidence presented in the interviews did "not adequately demonstrate[ ] that [Dedefo] has undergone the necessary moral change to be reinstated to the practice of law." In light of the "insufficient record," the Director could not make a recommendation to the Panel as to Dedefo's fitness for reinstatement.

Pursuant to Rule 18, Rules on Lawyers Professional Responsibility (RLPR), on August 12, 2009, the Panel conducted a hearing on Dedefo's petition for reinstatement. The Panel consisted of three Board members: one lawyer and two nonlawyers. Dedefo testified on his own behalf and presented the testimony of four additional witnesses.

Dedefo admitted in his testimony that when he and his ex-wife had arguments, he would regularly grab her and hit her. He testified that in Oromo culture, such behavior is considered "natural and normal" and is "not considered as abuse." He stated that although he did not consider his actions to be physical abuse at the time, he now understands that he "made a mistake" and "shouldn't have done that." He "realized slowly, gradually," since the time of his suspension that hitting one's wife "[is] considered physical abuse in this system." Dedefo further admitted that he had falsely denied the abuse at his disciplinary hearing.

Dedefo went on to discuss the lawsuit he filed against the three people who had allowed his wife to stay with them in their homes. He explained that their actions made him very angry because he had been raised to believe that "a wife never spend[s] one night in [an]other person's house. That is considered a shame in my culture." Dedefo stated that he now understands that in this society a woman has a right to stay with friends, and he was wrong to file the lawsuit. He further explained that his error has "ma[d]e [him] a better person" because he has learned to see things from the perspective of others. He stated:

> [A]t that time, what I was thinking was my culture and background and my values, my wife acting like that and my friend doing that. But now when I see, I should know that I am in a different system, I'm in a different culture, I'm in a different society, so I shouldn't have done that. I was angry at that time, that's why I did it. But I shouldn't have done that.

---

[1]. The general preconditions for reinstatement required that Dedefo: (1) comply with the notice requirements of Rule 26, Rules on Lawyers Professional Responsibility; (2) pay to the Director $900 in costs and disbursements; and (3) comply in all respects with Rule 18(a)–(e), RLPR. *Dedefo*, 752 N.W.2d at 532.

Dedefo also admitted that during his deposition in connection with the lawsuit, he was "stubborn" because of his anger and "did not disclose the information I was supposed to disclose." Dedefo conceded that the affidavit in his wife's name recanting the abuse accusations was false. He testified that he drafted the affidavit, and that he now believes that his wife did not agree with its contents but signed it anyway because she was afraid of him. He stated that his "judgment was cloudy" when he filed the affidavit, and that filing it was a mistake.

Dedefo testified that during his disciplinary hearing, he denied the allegations regarding the abuse of his wife and the resulting meritless lawsuit that he filed. He stated that at the time of the disciplinary hearing, he did not understand why the Board and the government should have any interest in matters that he viewed as personal family issues. Because of that belief, losing his license "was a very shocking moment." Many members of the worldwide Oromo community called him to ask about the suspension, which had been publicized on the Internet. Dedefo initially told people that the suspension was the fault of his ex-wife and the three former friends who were defendants in the lawsuit he filed.

After the shock of losing his license, Dedefo testified that he "s[a]t back" and "reflect[ed]" and "came to the conclusion that … this thing is my fault." He stated that he now blames only himself for the serious mistakes he made in the way he handled the matters regarding his ex-wife and his three former friends. Dedefo testified that since his suspension, he has learned that "when you are angry, you lose … your thinking power." He has read self-help books about anger management and learned that it is best to try "[t]o see things in other people's perspective and

not to do things while you are angry." He testified that "things happen for a reason" and that the suspension has "made [him] a really … different person." Since his suspension, Dedefo has counseled people to "use anger to do good things in a positive way," rather than allowing anger to control decisions, and cited himself as an example of what can go wrong when people act rashly out of strong anger.

Dedefo testified that he feels sorry for the expense incurred by the defendants in his meritless lawsuit, and for his ex-wife having had to "go through all these things." He testified that he would like to apologize to the three defendants, but has been unable to do so because a split has since occurred in the local Oromo community and an apology would be seen as "a bigger issue" affecting the entire community. He also testified that he had not apologized to his ex-wife for abusing her.

After his suspension, Dedefo applied for many jobs—legal and nonlegal—but was unsuccessful. He took over a position as a part-time personal care assistant for his mother, a job that his brother had previously performed. Dedefo also has done significant volunteer work as a local leader in the Oromo Liberation Front (OLF). He has travelled widely to visit Oromo communities in the United States and abroad as a representative of that group. If his license to practice law is reinstated, Dedefo plans to return to his personal injury solo practice of law.

Dedefo's close friend Hassan Hussein testified on Dedefo's behalf. Hussein testified that he met Dedefo more than 25 years ago, when the two became friends at the University of Ethiopia. Hussein currently works as a full-time volunteer for the OLF and supervises Dedefo's work as a volunteer for that organization. Hussein testified that Dedefo served as the president of the Oromo Community of Minneso-

ta from 1998 until 2002, and that Dedefo's leadership improved the board's function, increased participation, gave the group "a firm foundation," and made the group "more professional" and "service oriented."

Hussein testified that Dedefo is generally dependable, generous, and kind, and is a person who views rules and regulations as "very important." Hussein stated that he was very disappointed when Dedefo filed the lawsuit regarding his ex-wife, and that the anger that led to that action was uncharacteristic of Dedefo. In Hussein's opinion, Dedefo was overly influenced by his conservative culture and the anger stemming from his "toxic relationship" with his ex-wife.

Hussein testified that he learned of Dedefo's suspension on the day it occurred. According to Hussein, Dedefo was upset after his license was suspended, but he then "gradually ... began to calm down and accept his responsibility." Hussein stated that "a couple of months after the suspension," it appeared that Dedefo "began to wake up from a deep sleep." Eventually Dedefo became "more like the Nuro [Hussein] knew ... for the last 25 years." Dedefo admitted to Hussein that he had abused his wife, that he should not have filed the lawsuit, and that the affidavit he had filed in the lawsuit was false.

Hussein also corroborated Dedefo's testimony about newfound insights regarding anger, testifying about incidents where Dedefo "advise[d] people to hear both sides of [an] argument before making a conclusion." Hussein heard Dedefo say to others, "look at me, I was angry like you and I did something that I was not supposed to do and you are making the same mistake. Why don't you think about this issue calmly rather than making a decision in the heat of the moment." According to Hussein, Dedefo advised people who were involved in heated conflicts surrounding the Oromo community split "to accept responsibility for their wrongs and move on." Hussein also stated that when Dedefo gives seminars for members of the Oromo immigrant community, he advises people that when Oromo culture surrounding marriage relationships conflicts with U.S. law, people should follow the law.

Another of Dedefo's friends, Kassim Hussein, testified next on Dedefo's behalf. Hussein met Dedefo when Dedefo was elected president of the Oromo Community of Minnesota in 1998. Hussein testified that Dedefo was a strong community leader who "br[ought] the team together and show[ed] the people how to work together with respect." According to Hussein, Dedefo· is "very loud" but "soft inside," is generous, and is "well known" for his respect for the rule of law. Hussein was a former client of Dedefo, and testified that Dedefo did a good job representing him.

After Dedefo was suspended, he told Hussein that the reasons for suspension were "filing the wrong affidavit and filing the lawsuit and comingling with the trust account." Hussein described his own personal challenges reconciling his upbringing with living in the United States, and expressed his opinion that Dedefo was "blinded" by a cultural issue that "influenced his personal decision making." Hussein testified that he has since seen a change in Dedefo, who has begun advising people to learn from his example and "not react when ... things are very hard." Hussein described discussions with Dedefo in which Dedefo talked about "how his culture influenced him to get into these issues" and stated his belief that he should try to "forget pretty much how the culture influenced him" and to reconcile culture and the law by "obey[ing] the law."

Wako Fatan Buta, an elder in the local Oromo community, testified next. Buta stated that Dedefo is a "nice and truthful

person." Buta testified that Dedefo represented him in a matter involving a car accident, but Buta had to find another attorney before the matter was concluded because of Dedefo's suspension. According to Buta, Dedefo did a good job with the case, but no progress has been made by Buta's new attorney because of the language barrier.

Buta testified about his involvement as an elder mediating in the dispute between Dedefo and his wife. According to Buta, Dedefo's wife and Dedefo's three friends committed serious cultural offenses when she stayed overnight in the friends' homes without her husband's consent. Buta offered his personal opinion that Dedefo should not have allowed his wife back into their home after she committed such an offense.

The final witness in Dedefo's reinstatement hearing was Omar Abdullah, another elder in the Oromo community. Abdullah testified that Dedefo represented Abdullah's three adult children in a case involving a car accident, and that Dedefo did a good job on the case. Abdullah observed that Dedefo was angry at the time of his suspension, but since then Dedefo "is done with all his anger and he is calm and he is quite a different person." Abdullah believed that Dedefo was right to be angry at his wife and the three defendants because "what was done was against our culture."

At the close of the evidence, the Director argued that Dedefo not be reinstated. The Panel issued an opinion concluding that Dedefo had not met the requirements for reinstatement, and recommending that his petition be denied.

### A. Standard of Review

■ We uphold a panel's factual findings in reinstatement proceedings "if they have evidentiary support in the record and are not clearly erroneous." *In re Holker,*

765 N.W.2d 633, 637 (Minn.2009). In *Holker,* we cited Rule 14(e), RLPR, regarding the ordering of a transcript, in our recitation of the standard of review. *Id.* That rule is part of the established procedures for disciplinary hearings. But we did not explain the applicability of that rule in the reinstatement context. *See id.*

Under Rule 14(e), if no transcript of the disciplinary hearing is available, we accept the factual findings of the referee because we cannot review the evidence supporting those findings. When a transcript of the entire proceeding is available, the findings of the referee are not conclusive. Although there is no precise counterpart for Rule 14(e) in the context of a reinstatement hearing, we employ the same common-sense principles here.

■ Our use of the clear-error standard in reinstatement cases does not represent a shift in our approach from earlier cases. *See, e.g., In re Anderley,* 696 N.W.2d 380, 384–85 (Minn.2005). We employ the clear-error standard to review factual findings here, as we do in most ordinary contexts. That standard appropriately accounts for the panel's ability to make credibility determinations, while maintaining our role to thoroughly review the record and correct erroneous findings when they are made. The panel's ultimate decision about an attorney's eligibility for reinstatement receives no deference from us. We independently review the entire record to determine whether an attorney should be reinstated. *In re Kadrie,* 602 N.W.2d 868, 870 (Minn.1999). We consider, but are not bound by, the panel's recommendations. *Id.*

### B. Reinstatement Requirements

■ The issue in this case is whether Dedefo has demonstrated by clear and convincing evidence that he is entitled to

be reinstated to the practice of law. A petitioner seeking reinstatement must first demonstrate that he or she has met the general reinstatement conditions imposed in this court's suspension order. *In re Mose,* 754 N.W.2d 357, 360 (Minn.2008); *see Dedefo,* 752 N.W.2d at 532 (listing preconditions placed on Dedefo). The Panel concluded that Dedefo fulfilled the general reinstatement conditions.

A petitioning attorney must also establish by clear and convincing evidence that he or she " 'has undergone such a moral change as now to render him a fit person to enjoy the public confidence and trust once forfeited.' " *In re Singer,* 735 N.W.2d 698, 703 (Minn.2007) (quoting *In re Jellinger,* 728 N.W.2d 917, 922 (Minn. 2007)). Evidence of moral change comes from an observed record of appropriate conduct by the petitioner, as well as "the petitioner's own state of mind and his values." *In re Kadrie,* 602 N.W.2d 868, 870 (Minn.1999) (citing *In re Swanson,* 405 N.W.2d 892, 893 (Minn.1987)). Reinstatement requires stronger evidence of good moral character and trustworthiness than an original admission to practice. *In re Reutter,* 474 N.W.2d 343, 345 (Minn.1991) (citing *In re Strand,* 259 Minn. 379, 380, 107 N.W.2d 518, 519 (1961)). We consider the following additional factors: (1) the petitioner's recognition of the wrongfulness of his conduct; (2) the length of time since the original misconduct and the suspension; (3) the seriousness of the original misconduct; (4) the existence of physical or mental illness or pressures that are susceptible to correction; and (5) the petitioner's intellectual competency to practice law. *Singer,* 735 N.W.2d at 703.

### C. Moral Change and Recognition of Wrongfulness

The factors of moral change and recognition of the wrongfulness of past conduct are intertwined, and the Panel followed our lead in previous cases and considered these factors together. *See, e.g., Holker,* 765 N.W.2d at 639 n. 2. The Panel recommended that Dedefo not be reinstated to the practice of law at this time because he "failed to demonstrate by clear and convincing evidence that he has undergone the requisite moral change and recognizes the wrongful nature of his prior misconduct." The Panel found deficiencies in Dedefo's evidence regarding whether he "understands the wrongfulness of his misconduct" and whether he "is truly remorseful for the consequences of that conduct."

Regarding Dedefo's understanding of his misconduct, the Panel stated generally that Dedefo's "demeanor at the hearing and the actions he and other witnesses cited in support of that recognition do not establish [his understanding] by clear and convincing evidence." The Panel more specifically disapproved of Dedefo's "blam[ing] his wife" for the events leading to the suspension "even after [the] suspension" occurred. According to the Panel, "[c]ontinuing to blame others, even in part, [for the suspension] weighs against a finding that [Dedefo] recognizes the wrongfulness of his misconduct. . . ."

Regarding remorse, the Panel said that Dedefo's references to misconduct as a "mistake" for which he was sorry "appeared . . . more scripted than heartfelt." The Panel specifically faulted Dedefo's repeated use of the word "shocked" to describe his feelings at the time of his suspension—a word choice that the Panel concluded "express[ed] more remorse for what happened to him than for the consequences to the victims of his conduct and to the profession as a whole." The Panel further objected to Dedefo's use of cultural explanations for why he had failed to make

amends to his ex-wife and the defendants in his lawsuit.

■ We generally "will defer to a panel's finding that a petitioner's testimony that he has undergone the requisite moral change is not credible." *Mose,* 754 N.W.2d at 362; *see also In re Trygstad,* 472 N.W.2d 137, 140 (Minn.1991) (concluding that a petitioner's testimonial conflict did not bar reinstatement when the panel found genuineness in petitioner's remorse and change in his moral character). Two of the Panel's nonspecific conclusions—the reference to Dedefo's demeanor and the statement that his remorse "appeared" to be "more scripted than heartfelt"—are akin to credibility findings. But the Panel supported its recommendation primarily with other, noncredibility-based findings about the evidence at Dedefo's reinstatement hearing. Those findings contain troubling deficiencies that create doubt about the Panel's ultimate recommendation.

■ The Panel focused heavily on Dedefo's testimony about his mental state at the time of his suspension—especially his references to being "shocked" and his initial placement of blame for the suspension on his ex-wife and the defendants in his meritless lawsuit. But the appropriate inquiry is not whether the petitioning attorney underwent a moral change before suspension or immediately upon being suspended. Rather, we examine a petitioner's conduct up to the time of the reinstatement hearing and his or her mental state and values at that time. *See, e.g., Holker,* 765 N.W.2d at 637–39 (denying petition for reinstatement based on the content of the petitioner's testimony at the reinstatement hearing); *Anderley,* 696 N.W.2d at 385–86 (reinstating an attorney largely because of the dramatic rehabilitation and character change he had under-

gone during the period of time following his discipline).

The Panel's finding that Dedefo, even after his suspension, "has on occasion blamed his wife ... rather than accepting full responsibility for his own misconduct" illustrates that Dedefo did not immediately undergo a complete moral change at the time of suspension. But we do not expect a petitioner to undergo instantaneous moral change upon suspension. The record reflects that Dedefo gradually came to realize the wrongfulness of his conduct and that by the time of the reinstatement hearing, Dedefo had ceased blaming others and taken full responsibility for his actions.

The Panel understood Dedefo's use of the word "shocked" to mean he was surprised to be suspended because he did not understand the nature of his wrongdoing. Dedefo candidly admitted this point during his reinstatement hearing. But the Panel's assessment ignored Dedefo's extensive, internally consistent testimony about his process of coming to understand his past failings and his subsequent efforts to ensure he does not repeat them. Dedefo testified about how the "shock" of the suspension operated to initiate a moral change by forcing him to enter a period of self-examination and improvement. He "gradually" came to understand that he had committed serious wrongdoing when he filed the lawsuit against his friends and filed a false affidavit as part of the suit. Dedefo's testimony makes clear that he is no longer surprised that he was suspended, and that he now understands he alone was at fault. This gradual process of reflection and moral progress lends support to Dedefo's claim that he has undergone the requisite moral change in preparation for return to the practice of law.

The Panel made a finding that Dedefo "knowingly provided false evidence" at his 2007 disciplinary hearing and described

the production of false evidence as "more recent conduct involving dishonesty." Dedefo argues that the Panel's finding "presents an impossible Catch 22." Dedefo's false testimony at his disciplinary hearing occurred prior to his suspension. We concluded that he testified dishonestly at his disciplinary hearing, *Dedefo*, 752 N.W.2d at 529, and considered that fact in choosing the appropriate discipline. *Id.* at 531–32. In our discussion of the discipline to be imposed, we said that Dedefo

> refused to acknowledge that his conduct in his deposition was discovery abuse, acknowledging only that "looking at the matter in hindsight, he might have handled it differently." Both at the referee hearing and before this court, Dedefo continued to vehemently deny abusing [his wife.] Dedefo used his abusive relationship with [his wife] to file a false affidavit with the district court.

*Id.* at 531. The Panel's finding on this point is another example of its focus on Dedefo's mental state at the time of suspension rather than the time of his reinstatement hearing.

■ We typically look favorably on petitioners who have openly admitted the wrongfulness of their conduct. *See, e.g., In re Wegner*, 417 N.W.2d 97, 99 (Minn. 1987). Dedefo cannot now deny his dishonesty at the time of his disciplinary proceedings without continuing the course of misconduct that led to his suspension. *See, e.g., Holker*, 765 N.W.2d at 637 (denying a petitioner's reinstatement petition in part because he continued to minimize and dispute his past misconduct). Dedefo's present candid admissions of his past misconduct weigh in favor of his reinstatement.

The Panel also expressed concern about Dedefo's "continuing resort to cultural concerns to explain and defend his actions." Our review of the record makes clear that Dedefo did not present evidence about his cultural background to defend his actions or minimize his wrongdoing. Rather, Dedefo explained elements of his culture in order to show his understanding of how and why the misconduct occurred in the past and how he now " 'perceives and rejects the wrongfulness of his previous conduct.' " *Swanson*, 405 N.W.2d at 892 (quoting *In re Peterson*, 274 N.W.2d 922, 926 (Minn.1979)). Dedefo expressed awareness of one of the precise causes of his misconduct—the heavy influence of cultural beliefs that conflicted with his legal obligations. Because he now understands where he went wrong, Dedefo believes that he will be able to avoid pitfalls resulting from cultural discrepancies in the future.

In its opinion and during the reinstatement hearing, the Panel revealed its concern with Dedefo's failure to "mak[e] amends" by apologizing to his ex-wife for abusing her and to the three former friends for the expense and inconvenience Dedefo's lawsuit caused them. To the extent that the Panel suggests that Dedefo must apologize to his ex-wife for abusing her, the Panel misinterprets the reinstatement requirements. Dedefo's abuse of his wife was wrong and illegal—a fact that he now acknowledges—but the abuse was not the conduct for which we suspended him. And although our past cases make clear that restitution, apologies, and other methods of making amends to the victims of wrongdoing are probative of a suspended attorney's moral change, we have never held a failure to apologize to a victim against a reinstatement petitioner.

Dedefo's testimony about his moral change was unrefuted by any evidence in the record and was corroborated by two witnesses. Both Hassan Hussein and Kassim Hussein know Dedefo well, and both testified that they observed marked changes in Dedefo's affect and behavior

after he came to understand how he had made a serious mistake by filing the lawsuit against his friends. Both witnesses testified that Dedefo counseled others to take care not to allow their decisions to be driven by anger and to follow the law even when it conflicts with traditional Oromo culture. The Panel described both witnesses as "thoughtful" but nonetheless dismissed their testimony as insufficient, without further explanation as to deficiencies in the witnesses' testimony.

The Panel's focus in this case strayed from the moral change analysis that we have fashioned for reinstatement proceedings. The Panel focused its inquiry on Dedefo's mental state and values at the time of his suspension rather than at the time of his reinstatement proceedings. Further, the Panel placed undue weight on Dedefo's failure to apologize and misinterpreted his evidence about his cultural background as a justification or defense of his misconduct. The Panel also erroneously characterized Dedefo's dishonesty at the time of his disciplinary proceeding as new misconduct. Finally, the Panel disregarded Dedefo's candid, internally consistent testimony about his dramatically changed view of his misconduct, his efforts to manage anger, and his public acknowledgement of his wrongs, coupled with advice to others about how to avoid similar downfalls. That testimony was corroborated by two witnesses whose testimony the Panel viewed favorably. In light of these problems with the Panel's analysis, we conclude the Panel's finding that Dedefo has not undergone a moral change is unsupported by the record and clearly erroneous. Our independent review leads us to conclude that Dedefo has clearly and convincingly shown that he has undergone the moral change required of a petitioner for reinstatement to the practice of law.

### D. Other Factors

We also consider the other reinstatement factors: the time since Dedefo's misconduct and suspension, the seriousness of his original misconduct, physical or mental illness, and his intellectual competency to practice law. The Panel acknowledged that "some time has passed" since the misconduct that led to Dedefo's suspension. In fact, the primary misconduct that led to his suspension—the filing of the meritless lawsuit and the false affidavit—occurred more than eight years ago. The Panel also noted that Dedefo applied for reinstatement only three months after his six-month minimum suspension period expired, but did not comment about whether that time period weighs for or against reinstatement. Dedefo has now been suspended for 20 months. We conclude that the passage of time since the misconduct and suspension weigh in favor of reinstatement in this case.

The Panel next stated that Dedefo's "misconduct was serious," but did not make a finding that the seriousness weighed against reinstatement. Although the question of fitness to be reinstated includes consideration of the past misconduct, we have said that "even serious misconduct should not bar reinstatement when the petitioner has undergone the imposed discipline." *Mose*, 754 N.W.2d at 364 (citing *Kadrie*, 602 N.W.2d at 871). Although we recognize that Dedefo's misconduct was very serious, we conclude that the discipline imposed was sufficient to bring about the requisite moral change, and the seriousness of the misconduct does not now weigh against him.

The Panel did not find any relevant issues regarding the factor of physical or mental illness or pressures that are susceptible to correction. This factor is not an issue in his case.

Regarding the final factor, the Panel "found no evidence [that Dedefo] does not have the intellectual competency to practice law." Dedefo argues that because he is current in his CLE reporting requirements relevant to his practice area and because the Director has not challenged his competence, this factor weighs in favor of his reinstatement. We agree.

### E. Reinstatement and Supervised Probation

We conclude that Dedefo has shown by clear and convincing evidence that he has undergone a moral change and is entitled to be reinstated to the practice of law. We therefore reinstate him, subject to a two-year period of supervised probation governed by the following conditions agreed upon by the Panel, the Director, and Dedefo:

(1) Dedefo shall cooperate fully with the Director's Office in its efforts to monitor compliance with probation and promptly respond to the Director's correspondence by the due date. Dedefo shall provide to the Director a current mailing address and shall immediately notify the Director of any change of address. Dedefo shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, Dedefo shall provide authorization for release of information and documentation to verify compliance with the terms of probation.

(2) Dedefo shall abide by the Minnesota Rules of Professional Conduct.

(3) Dedefo shall be supervised by a licensed Minnesota attorney appointed by the Director to monitor compliance with the terms of his probation. Dedefo shall provide to the Director within two weeks from the date of this decision the names of up to four attorneys who have agreed to be nominated as Dedefo's supervisor. If, after diligent effort, Dedefo is unable to locate a supervisor acceptable to the Director, the Director will seek to appoint a supervisor. Until a supervisor has signed a consent to supervise, Dedefo shall on the first day of each month provide the Director with an inventory of active client files described in paragraphs (4)–(5) below. Dedefo shall make active files available to the Director upon request.

(4) Dedefo shall cooperate fully with the supervisor in his/her efforts to monitor compliance with this probation. Dedefo shall contact the supervisor and schedule a minimum of one in-person meeting per calendar quarter. Dedefo shall submit to the supervisor an inventory of all active client files by the first day of each month during the probation. With respect to each active file, the inventory shall disclose the client name, type of representation, date opened, most recent activity, next anticipated action, and anticipated closing date. Dedefo's supervisor shall file written reports with the Director at least quarterly, or at such more frequent intervals as may reasonably be requested by the Director.

(5) The inventory of active client files described in paragraph (4) shall include for each litigation matter the date Dedefo served or filed a pleading, shall identify any depositions that Dedefo intends to take or defend, and shall describe any motions brought by or against Dedefo's client. Upon the request of Dedefo's supervisor, Dedefo will provide the supervisor with copies of such litigation documents.

(6) Dedefo shall initiate and maintain office procedures that ensure that there are prompt responses to correspondence, telephone calls, and other important communications from clients,

courts, and other persons interested in matters that Dedefo is handling, and that will ensure that Dedefo regularly reviews each and every file and completes legal matters on a timely basis. (7) Dedefo shall maintain law office and trust account books and records in compliance with Rule 1.15, MRPC, and Appendix 1 to the MRPC. These books and records include the following: client subsidiary ledger, checkbook register, monthly trial balances, monthly trust account reconciliation, bank statements, canceled checks, duplicate deposit slips and bank reports of interest, service charges and interest payments to the Lawyer Trust Account Board. Such books and records shall be made available to the Director within 30 days of this decision and thereafter shall. be made available to the Director at such intervals as he deems necessary to determine compliance.

So ordered.

DIETZEN, J., took no part in the consideration or decision of this case.